BOUTALL, Judge.
Louisiana Power & Light Company sued a residential customer, Clyde V. Bourgeois, Jr. for additional electric service furnished, but not billed and paid for, allegedly as a result of certain meter tampering devices on the customer’s meter. The customer reconvened for damages as a result of termination of his electrical service. The trial court dismissed both the original demand and the reconventional demand, and only Louisiana Power & Light has appealed.
In a routine area check, employees of Louisiana Power & Light examined the meter installation at the Bourgeois home and found two devices installed within the meter box, both of which enabled the customer to use electricity without paying for the entire amount used. There is no proof that Bourgeois installed, or caused the installation of, these devices although the meter is located on the wall of his residence in a fence-enclosed area and he is the sole beneficiary of the electrical service. The suit is couched in the terms that the service contract between the parties provided that the consumer should pay for all the electricity used, and the consumer only paid for a portion of the electricity used, this demand being for the balance due.
The facts in this case show unquestionably that Louisiana Power & Light is entitled to recover, and that only the amount of the recovery is in dispute. The *599 facts are that the house was a new house built by Bourgeois and that the meter was installed in July, 1973 at the end of construction. The employee who installed the meter testified that at that time.it was free of any tampering devices. The house was occupied by Bourgeois and has been occupied by him ever since down through the discovery of the devices on April 1, 1975. As noted above, the meter is in a place not freely accessible to any casual passerby, and indeed the devices are such that they must have been intentionally placed therein.[1] The only beneficiary of the diverted electricity was Mr. Bourgeois. The service agreement entered into evidence provides that the consumer is required to pay for all of the electricity used.
It is apparent in this case that he did not pay for what electricity was used and he cannot disclaim responsibility for the unme-tered electricity being used in his premises where he was the sole beneficiary of the unmetered current.
The problem in this case is the establishment of the amount of unmetered electricity used. The trial judge recognized this problem in his detailed written reasons for judgment and summed it up as follows:
“Therefore, the Court is unable, from the evidence adduced, to arrive at any reasonable amount that may be due said utility company. The reasons are obvious. The plaintiff, through its own admissions, cannot by any reasonable degree of certainty determine when said tampering devices were installed. As far as the Court is concerned they could have been installed as early as July, 1973, prior thereto, or as late as April, 1976. Further, the Court is not impressed with the basis upon which plaintiff seeks to prove that said tampering devices were installed one year prior to discovery, i. e., by fluctuations in billing history, particularly in view of the fact that Mr. Bennet testified, upon cross-examination, that he has viewed billing histories of customers of plaintiff on numerous occasions and that fluctuations such as those of Bourgeois has been noticed in those particular accounts in the absence of meter tampering.”
While we agree in general with the observations of the trial judge, we are of the opinion that he imposed too strict a burden of proof upon plaintiff. The evidence presented does not prove conclusively entitlement to the amount of damages sought, but in this type of case it is only required that the damages be proven with a legal certainty dependent upon the facts in each individual case as it arises. Jolley Elevator Company v. Schwegmann Bros. Giant Supermarkets, 230 So.2d 640 (La.App. 4th Cir. 1970). Louisiana Civil Code Article 1934 which provides the measure of damages for breach of contract recognizes in sub-section 3 that there are cases in which the damages may not be able to be precisely measured and has granted to the judge discretion for the fixing of such damages. Certainly it was contemplated by the parties at the time of entrance into the electric service agreement that the customer would pay for all of the electricity used.
In assessing the amount of electricity used and not paid for in this case, the utility offered proof that the meter did not have any diversion devices on it when installed in July 1973, and that two devices were found in the meter assembly on April 1, 1975. The devices were removed April 16, 1975. There can be no question as to the operation of the devices from April 1 to April 16, but when prior to April 1, 1975, and after July, 1973 were they installed? In answer to this question plaintiff offered the testimony of district representative Eugene Bennett, who examined the billing history of Mr. Bourgeois and, based upon his general knowledge and the particular fluctuations in the Bourgeois bills, concluded that one device, the screw type by-pass, was installed in the October-November period for service billed to November 13,1973. *600 He concluded the other device, the wire “jumpers”, was installed during the October-November period for service billed to November 14, 1974. We would agree with the trial judge that this evidence standing alone does not constitute sufficient proof to show installation. However we think the testimony of Mr. Bourgeois furnishes the necessary proof. His explanation of the devices was that he knew nothing of their installation except that at the completion of his building he was aware that some problem had arisen with the acceptance of the electrical service with the Parish Inspectors and there were jumpers installed in the meter at that time. The inference from his testimony is that those devices were never removed from the meter.
We conclude that there is sufficient evidence to show the defendant did breach his contract to pay for all electrical service furnished. In this case the measure of damages is the amount of electricity unpaid. As stated in the case of North American Contracting Corp. v. Gibson, 327 So.2d 444 (La.App. 3rd Cir. 1975):
“In general then, the measure of damages for breach of a contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled. Harelson v. Parish of East Baton Rouge, 272 So.2d 382 (La.App. 1st Cir. 1972). The amount of damages must, however, be determined in relation to the contract and the circumstances which surround it. Jolley Elevator Company v. Schwegmann Bros. Giant Supermarkets, 230 So.2d 640 (La.App. 4th Cir. 1970).”
Plaintiff however, does not seek compensation for the diverted electricity from the time that it concluded the devices were installed. Instead it seeks an amount equivalent to the amount that defendant was actually billed during the one year period prior to April, 1975. It explained that the purpose in so billing was because the screw device had diverted 44.35% of the current used from the time of its installation and that the wire jumper device diverted all of the current used by any appliances hooked upon that line. It concluded that with the length of time involved and the amount of diversion, this compromise would be fair to the customer. We cannot approve this assessment of the amount of electricity used.
We note that the only appliance shown to be drawing current on the wire jumper line which did not register in the meter was the air-conditioner. Plaintiff concludes that that was installed in the period October-November, 1974. The billing period ended April 1975. Defendant testified that during this period he spent only a part of his time at home, ordinarily being away at his camp three or four days a week. This is the cold part of the year and a simple statement that an air conditioner would use $10 to $15 electricity per ton per month is not probative. There is no evidence as to how much the air conditioner was used during this period. We agree with the trial judge that to attempt to fix this amount would be speculation.
However, the screw type tampering device is another matter. This type of meter is so constructed that, to facilitate service on the meter, and to continue to provide electricity to the customer while the meter is being serviced, screws may be inserted into the meter in such a way as to provide a continuous circuit while the meter itself is being dismantled. The diversion of current in this fashion on this type of meter is precisely measured at 44.35% of the amount that would ordinarily pass completely through the meter itself. The billing during this period was $412.30, which represents 55.65% of the total amount of electricity used. By mathematical equation, 44.35% of the total used amounts to $328.58.
For the above reasons, we reverse the judgment appealed and now render judgment in favor of plaintiff, Louisiana Power and Light Company, and against defendant, Clyde V. Bourgeois, Jr., in the sum of J5328.58 with legal interest from date of this judgment until paid. Each party to bear his own costs.

REVERSED AND RENDERED.

. To install either device requires opening a sealed meter cover and fixing the device with tools and equipment. The jumper cables are attached in the meter box and run through conduit into the building to service electrical equipment.