## DELTA SAFETY AND SUPPLY DIVISION OF CHROMALLOY AMERICAN CORPORATION

v.

## NORTON SAFETY PRODUCTS DIVISION OF NORTON COMPANY.

Civ. A. No. 78–229.

United States District Court,
E. D. Louisiana.

Feb. 14, 1980.

James E. Stovall, New Orleans, La., for plaintiff.

Earl S. Eichin, Jr., New Orleans, La., for defendant.

BEER, District Judge.

This matter came on for trial on January 10, 1980. At the conclusion of the trial, all counsel were given an opportunity to file briefs, which have been considered by the court.

In the court's view, the record supports these findings:

In June of 1967, Welsh, Division of Textron (hereinafter, "Welsh"), and Delta Safety & Supply Division of Chromalloy American Corporation (hereinafter, "Delta") commenced a supplier-distributor relationship in the course of which Welsh supplied Delta with their product line of industrial safety equipment, and Delta, accordingly, undertook to merchandise same within its then local area of operations.

There was no written agreement between the parties nor were any specific commitments made between the parties establishing quantities of such industrial safety equipment to be provided to Delta—although it was implicit in the commencement of the relationship that there was a mutual feeling that Delta would eventually merchandise most, if not all, of the line of industrial safety equipment items made available to the market by Welsh. At that time (and at all other times pertinent), Delta continued to handle other lines of industrial safety equipment, but, as time passed, Delta's concentration of merchandising, at least with respect to a substantial range of items, was directed to the safety equipment manufactured and distributed by Welsh.

The arrangement above described was, essentially, consistent with general existing arrangements that were made between suppliers and distributors in the industrial safety equipment industry, and both parties to the arrangement had reason to hope for a continuing, expanding and mutually beneficial relationship.

The relationship did, apparently, strengthen and prosper over a period of approximately eight to nine years during which Delta materially increased its sales activities as they had to do with Welsh products and, thus, they became a significant distributor of Welsh products in the Gulf Coast area with apparent concentration in southeast Texas and southwest Louisiana but with some satellite operations ranging substantially farther away.

Delta used its personnel and other resources to promote and display a number of items in the Welsh line and, indeed, in various instances had the Welsh line specified for use in certain industrial plants and factories where the Delta salesmen were generally well received. In addition to this, Delta sought to affirmatively assist Welsh in updating and revising their product line so as to be responsive to the industrial requirements for the various items of safety equipment whose use was prevalent in a particular industry. All in all, the relationship was "good business" for Welsh and Delta, although it is apparent that there were periods during this relationship when Delta was erratic in their handling of invoice payments due Welsh. This practice seems to have been essentially tolerated by Welsh in view of the overall relationship between the parties.

In the spring of 1976, apparently as the result of brief but intense negotiations, Norton Safety Products Division of Norton Company (hereinafter, "Norton") bought out the Welsh interests noted above and, for all intents and purposes, assumed the then existent Welsh relationship vis a vis Delta. News of the acquisition of Welsh by Norton caused some concern at Delta, and Delta's officers sought to get some sort of reading from the Norton executives as to the status of the relationship between the parties as a result of the acquisition. There were no clear signals at first, and the relationship seemed to continue along the same course that had existed previously, but it was obvious that some changes were about to take place—particularly insofar as cash flow was concerned. Thus, it came as no great surprise to either of the parties when their officials met in July of 1976 to discuss their future with each other, that the cash flow or credit problem was first on the list of priorities for consideration. Though it is not clear as to exactly how the meeting was conducted, the court is of the view that Norton's representatives were categoric in their indication that the Norton policy was to hold to a much stricter payment schedule than that which had been existent during the course of the Welsh operations. Even so, the general viability of the relationship with Delta was indicative of a continuation of same subject, however, to tighter payment schedules as noted above.

Apparently some efforts were made by both Delta and Norton to resolve the payment situation, but, even as late as October of 1976, the relationship appeared, to some extent, in doubt. At that time, representatives of Norton and Delta came into contact with each other at a trade show, but the only result of this contact was a somewhat vague and not very reassuring indication by Norton that the relationship would, apparently, continue since no indication to the contrary had been sent out by Norton or received by Delta. However, it is clear to the court that as early as October of 1976, Delta had some cause to sense that for various reasons (credit problems most likely), the continued relationship with Norton was threatened. Even so, the basic relationship continued as previously described, but obviously with a wariness on the part of both Norton and Delta as to its continued viability.

The court thus believes that it was not a complete surprise for Delta to receive written notification in the latter part of December, 1976, indicative of Delta's termination of the relationship between the parties. Specifically, by letter dated December 23, 1976, Norton informed Delta that, effective immediately, they would no longer be a distributor of the line of products that had been previously made available by Welsh and was, up until then, being made available by Norton. The reason for the termination was indicated to be a streamlining process initiated by Norton, and referred to by them as selective distribution.

As of the time of the termination notice, Norton had not established or implemented a clearcut policy for handling return of goods from distributors either in the instances where those distributors had ongoing reasons for returning goods or in an instance where a distributor had been subject to a termination of the distributor relationship, as was the case here. Welsh had, previously, set up an informal method of handling returns which, on its face, was not all that much different from the Norton policy that was established subsequent to the termination notice. However, the actual effect of the subsequently established Norton return policy was, essentially, prejudicial to Delta in the circumstances of their dismissal or termination.

Essentially, the court concludes that Norton chose to enforce a return of goods policy that was more stringent and, indeed, in some instances, more arbitrary than that which had been previously in existence if, indeed, it can be said that any specific return policy was in existence during the earlier part of the relationship between the parties. It might be an oversimplification, but the court concludes that the return policy that existed prior to the Norton acquisition of Welsh was one that was founded upon an equitable basis, one which took

equitable factors into account. On the other hand, the policy announced by Norton (after the termination of Delta) was not calculated to do very much more than totally protect the Norton interests.

Thus, the court believes that the abrupt termination rendered the inventory that Delta had on hand far less susceptible to such equitable return policies as previously would have been the case. Furthermore, the abrupt termination of the relationship had the effect of rendering portions of the inventory on hand less valuable due to the fact that the flow inherent in the supply and sale of replacement parts was, obviously, impaired by Delta's loss of standing as a distributor. This situation was compounded by other factors which the court believes are supported in the record. Specifically, Delta was placed in a position where it was obliged to look for a replacement line of industrial safety equipment; thus, certain inventory items in the now discontinued line would be less saleable by reason of the fact that Delta would be carrying a competing line of products in the same general field. Furthermore, certain products involved had short shelf life and, as such, fell sharply in value during the protracted negotiations between the parties required to set a clearly defined return policy.

On the other hand, certain items in the inventory were clearly destined to be Delta's sole responsibility, as, for example, products which had been embossed in a particular way so as to limit their saleability to only a few or a single market, as well as odd items that had not been properly or carefully warehoused so that they were not readily susceptible to repackaging and resale through another outlet by the Norton interests.

Indeed, some of Delta's efforts to mitigate its loss with respect to certain inventory items were as self-serving in Delta's behalf as were some of the Norton return policies. Even so, it is the court's view that Norton's general unwillingness to seriously try to resolve the return problem was the precipitating fact in causing a loss to be suffered by Delta which would not have been the case if a generally equitable return policy had been adhered to. Thus, the court is of the view that a part of the damage that has accrued with respect to the nonreturned inventory items is due to unsatisfactory actions on Norton's part, though mitigated to some extent as will be more particularly discussed hereafter.

Further, in this general area, the court is of the view that some loss of profits has been experienced by Delta as a result of the actions hereinabove described, and that a portion of that loss must be borne by Norton as will also be more particularly discussed hereafter.

The court concludes as a matter of law that the relationship which had come to exist between Delta and Welsh precipitated a basis for some continuing obligations as between the parties, and the court is further of the view that, at the least, such obligations included a requirement for reasonable notice of termination of the arrangement as well as reasonable return policies with respect to inventory items—particularly inventory items affected directly by and as a result of the termination. The court is further of the view that the totality of the acquisition of Welsh by Norton carried with it an obligation extending to Norton to be responsive to such obligations as would have otherwise evolved upon Welsh. Thus, the termination of the relationship with Delta was, for all valid intents and purposes, a termination of a continuing relationship which had existed for a number of years between Welsh and Delta.

The abrupt termination of the longstanding relationship and the overall policy with respect to return of merchandise formed a legal basis for a claim by Delta against Norton with respect to loss of profits and loss suffered from the failure to be able to make certain returns of inventory. A written contract between the parties was not necessary to set up a mutuality of obligations under circumstances such as have been found to exist here. A minimum standard of conduct in the business community that encompasses the operations of Norton and Delta require something more than ab-

rupt notice of termination without apparent recourse both with respect to further operations and inventory returns. On the other hand, the somewhat transitory nature of the industry, the apparent intense competition all across the spectrum of this industry, including the fast tempo in which new products are developed, packaged and marketed, as well as the apparent personnel changes and turnovers, are factors which must be considered in determining the reasonableness of time period required for some notice of termination.

The court concludes that under the particular circumstances of this case, a three-month notice of termination was reasonable. As noted above, various factors must be considered in reaching a conclusion regarding the reasonable length of time for notice. The court concludes that the facts and circumstances of other business relationships might provide a basis for longer or shorter notice periods—or for a different result with respect to the obligations vis a vis the return of inventory. While the court feels that it is important to limit its decision to this case in view of the paucity of Louisiana law, the court expresses the view that this kind of relationship must carry at least minimum obligations.

While the proof of damages is not clear or exact, I am obliged to proceed with reasonable discretion in assessing the quantum based on all the facts and circumstances of the case. *Jordan v. Travelers*, 257 La. 995, 245 So.2d 151 (1971); *North American Contracting Corporation v. Gibson*, 327 So.2d 444 (3rd Cir. La.App.1975), writ refused, 332 So.2d 280 (La.1976).

I believe that Delta is entitled to be paid $20,000 to cover the loss occasioned by the abrupt termination and further conclude that the only way to finally adjudicate the inventory return controversy is to order that no further actions are required of either party insofar as returns are concerned but that Norton shall be cast in judgment with respect to this aspect of the claim in the amount of $15,000.

Counsel for plaintiff is directed to prepare a judgment consistent with this minute entry and to circulate same to opposing counsel prior to submission to the court.