327 So.2d 444 (1975)
NORTH AMERICAN CONTRACTING CORPORATION et al., Plaintiffs and Appellants,
v.
John GIBSON et al., Defendants and Appellees.
No. 5266.
Court of Appeal of Louisiana, Third Circuit.
February 6, 1975.
Rehearing Denied March 17, 1976.
Writ Refused May 11, 1976.
*446 James L. Fortson, Jr., and Hal V. Lyons, Shreveport, Calvin T. Guidry, Lafayette, for plaintiffs and appellants.
Davidson, Meaux, Onebane & Donohoe by John G. Torian, II, Lafayette, for defendants and appellees.
Before CULPEPPER, GUIDRY and PAVY, JJ.
CULPEPPER, Judge.
This is a suit for damages for breach of a construction contract. The plaintiff, North American Contracting Corporation, was the general contractor for construction of an apartment project. Defendants subcontracted to furnish the carpentry labor. Plaintiff contends defendants failed to perform in a workmanlike manner, failed to follow the specifications and finally "pulled off" the job before completion. Defendants contend they quit work because plaintiff failed to pay them the monthly "draws" to which they were entitled under the contract. The district judge, without assigning reasons, rejected plaintiff's demands and dismissed its suit. Plaintiff appealed.
The apartment project was to be constructed on land owned by Dewey, Cheatham and Howe, Inc., which had previously entered into a contract with North American Contracting Corporation as general contractor. Both Dewey, Cheatham & Howe, Inc. and North American Contracting Corporation are controlled by Mr. R. L. Saucier, Jr. He is named as a party plaintiff, but actually has no individual interest in this suit. Turnkey Constructors, Inc., on the other hand, is owned by defendants, Jerry German and John Gibson. The subcontract provided that Turnkey was to perform the "carpentry work, rough carpentry and finish carpentry". Defendants were to furnish labor only. The general contractor supplied all the materials. The project was to be constructed according to plans and specifications to be provided by the general contractor at a later date. The price to be paid to the defendants was based on the number of square feet or linear feet completed at different stages of construction, as for example, 55¢ per square foot for "rough carpentry" and 30¢ for "trim out", etc. Defendants were to receive a monthly "draw" representing 90% of the price of the work completed in the prior month.
The project was to be financed by a loan from the Great American Mortgage Investment Company to Dewey, Cheatham & Howe, Inc. In this agreement, it was provided that "draws" would be submitted by North American as the work progressed and that the amount of a draw, less 10% "retainage", would be paid to Dewey, Cheatham & Howe, Inc. for ultimate payment to the subcontractors. These draws were to be certified by Dewey, Cheatham & Howe, Inc., North American Contracting Corporation and by the inspecting architect, Mr. Ellis. In effect then, the draws were certified by Mr. Ellis and by Mr. Saucier, since he controlled both corporations. The loan agreement, which had been perfected prior to the instant contract with the subcontractor, Turnkey, allowed a total of $96,000 to be borrowed for carpentry labor. Mr. Ellis was inspecting architect for both the owner and the mortgagee. However, Mr. Saucier also had a "superintendent", Max Lovelace, and later Jim Prine who was to check to be sure work was actually performed. Mr. Ellis was to inspect both workmanship and material and he certified draws by both the subcontractors and the general contractor.
The project was begun in August of 1971. Turnkey began work in the latter part of October or the first part of November of that same year. Work Progressed *447 smoothly for a while but later there was disagreement between the contractor and the subcontractor, Turnkey.
Though the contract provided that the subcontractor would be paid on a square foot basis, Mr. Saucier agreed that the first "draw" would be based simply on defendants' expenses. However, this was only for the first month's draw. Thereafter, the written contract controlled the draws. Mr. Saucier testified that after the first draw, amounts were certified to the mortgagee and a portion of that amount was paid to the subcontractor, Turnkey, according to "eyeball estimates" by him and his superintendent. Mr. Saucier continued to make draws and pay Turnkey in this manner until April of 1972, at which time he paid Turnkey for the work done during March. The trouble started when Saucier refused to pay Turnkey in May for work done during April. Saucier claimed that Turnkey at that point had already been overpaid for the work it had thus far completed. Turnkey disagreed and claimed that North American had breached its contract with Turnkey by failing to pay the amounts due. As a result of this disagreement, Turnkey "pulled off" the job and ceased all work on the project in early June of 1972.
There is no doubt that defendant Turnkey breached its contract with North American by "pulling off" the job without completing it. The first issue is whether defendants were justified in stopping work because they had not been paid the draws due under the contract. We ultimately conclude that at the time defendants pulled off the job, they had been paid more than the amount due them in draws under the contract.
We base our conclusion largely on the opinion of Mr. Jaco LeBlanc, a highly qualified architect, who had practiced for 18 years. Mr. Saucier contracted him in June of 1972 to do a progress report on the project. There is no evidence of any prior relations between them. In June of 1972, LeBlanc made a thorough examination of the project. He took pictures of the work and completed a room-by-room study of the amount of work that had been completed under the contract and of the quality of workmanship.
Mr. LeBlanc found that of the three units to be built in the complex, Unit 1 was 85% complete. He found Unit 2 to be 60% complete and Unit 3 only 50% complete. In Unit 1, for example, he found the paneling was not installed, some base molding was not installed, kitchen cabinets were not installed, hardware was missing, and linen closets were not installed. The photographs introduced into evidence clearly support his statements. Having determined the above percentages of the work completed from his inspection of the project, Mr. LeBlanc computed the monetary value of the carpentry work done by defendants using the square foot basis in the contract. On this basis, he computed that the value of the carpentry work completed by defendants was $49,875.56, including the 10% retainage. Thus, according to Mr. LeBlanc's figures, defendant should have been paid only 90% of that amount, i.e., $44,888, in draws. Actually, defendants had been paid $66,916.30. Thus, at the time they pulled off the job, defendants had received $22,028 in excess of the draws due them.
Mr. LeBlanc's figures must be accepted by us as correct for the reason that he was the only expert who made a detailed inspection to determine the amount due defendants under the contract. The only other witnesses testifying as to the value of the work completed were John Gibson, a defendant, and John Ellis, the "inspecting architect". Mr. Gibson's testimony was of little value. He was unable to recall the exact square footage that he had completed. In fact, he couldn't even estimate it. Mr. Ellis' testimony is of little, if any, value. He testified that he inspected the premises and estimated generally the percentage *448 of work completed at the time of each draw paid to defendants. He certified to Saucier and to the lending institution that the draws were in order. However, for at least the first two or three inspections, Mr. Ellis did not even know what the square foot price was according to the contract. He testified that he used the "percent completed", that is, he knew what the draw was and based his decision on the amount of work that appeared to be complete.
We cannot comprehend how Mr. Ellis could possibly give an accurate estimate as to the value of the work performed or as to the amount Turnkey should have been allowed to draw when he was ignorant of the contractual provisions governing price per square foot and had made no inspection on a square foot basis. Actually, he never did make any detailed inspection, and did not testify in this case as to the amount due defendants under their contract. Another factor that influences our decision is that Mr. Ellis worked with Mr. Gibson at the time he was "inspecting architect" for Mr. Saucier. Both Mr. Ellis and Mr. Gibson testified as to this, as well as Mr. Saucier.
Viewing this case as a whole, we are impressed with the argument that the uncontradicted testimony of Mr. Saucier shows the total amount, including the 10% retainage, which Turnkey could have received under its subcontract was $84,432. Defendants did not even attempt to dispute this figure. There is also no dispute that Turnkey had been paid a total of $66,916 in draws at the time it pulled off the job. If we figure the 10% retainage, Turnkey would have had to have completed $74,351 of work, or 88% of the total job, to justify the $66,916 it had already drawn when it quit work. The testimony of Mr. LeBlanc and the pictures filed in evidence show beyond question that this project was nowhere near 88% complete.
Defendant urges that our decision should be controlled by the contract between North American and Great American Mortgage Investors, and that Turnkey is entitled to whatever draws were received by plaintiff from the mortgage company for carpentry work. Saucier admits he requested and received from Great American larger draws for carpenter work than those he paid to Turnkey. But he explained that he deposited the excess in the corporation, Dewey, Cheatham & Howe, Inc., and that these amounts were reserved for contingencies, such as weather and interest rates.
It is irrelevant how much money was received by Mr. Saucier from these draws from Great American or whether they were deposited to the account of Dewey, Cheatham & Howe, Inc. or used for personal expenditures as defendants attempt to prove. The contract with which we are concerned is the one between North American Contracting Corporation and Turnkey Constructors. Under that contract, Turnkey was entitled to be paid each month based on the square feet completed according to the price per square foot in the contract. The only exception to this was an oral agreement with Mr. Saucier as to the first month only.
Under the contract then, Turnkey was entitled to an amount determined on that basis by a certain date each month and to no more. It makes no difference that Mr. Saucier had agreed with a third party to borrow more than that amount. North American was bound to Great American for any amounts borrowed, without regard to amounts due Turnkey.
It should be noted that the agreement with Great American was confected prior to the final contract between North American and Turnkey. As Mr. Saucier testified, that contract contained merely an estimate of expected costs for carpentry labor and was apparently large enough to allow for a reserve. It is also important that the forms on which draws were certified to Great American do not state that all amounts certified in that draw will be *449 paid to the subcontractor. It states only that "[t]he undersigned certifies that the work covered by this REQUIEST FOR PAYMENT has been completed in accordance with the CONTRACT . . ." This language is certainly flexible enough to allow for a contingency fund comprised of a portion of the requested draw, and even if we construed this language to require the borrower to pay all amounts to the subcontractor, the statement at most would be an admission by Mr. Saucier to be considered along with other evidence. A breach of that draw agreement by Mr. Saucier would in no way entitle Turnkey to more money than was stipulated in its own subcontract.
In addition to breaching the contract by ceasing work on the project, defendants breached it by failure to perform in a workmanlike manner. Our law implies in every building contract that the contractor or subcontractor will perform in a workmanlike manner. Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2d Cir. 1974); Hebert v. Ready Pierrotti, 205 So.2d 888 (La.App. 3rd Cir. 1968). In the present case, defendants' work did not meet this standard. The photographs introduced into evidence, which were taken by Mr. Jaco LeBlanc indicate clearly that the work on the apartment project was substandard. These photographs show doors not fitting properly wall studs out of line and not nailed properly, walls not on square and other defects. In addition, Mr. LeBlanc himself testified as to defects. He stated that doors were improperly hung, that rooms were the wrong size, that walls were misaligned and that in general the project exemplified poor workmanship.
Norman Parker, the painting contractor for the project, stated that the studding had not been finished by Turnkey enough to apply the sheetrock to it. He stated the place was dirty, that framing was missing, and that some studding was warped. He also reiterated that partitions were in the wrong place. The original supervisor for the project testified that the job was not kept clean and that there was a problem with Turnkey's absenteeism. He stated that Mr. Gibson's crew was usually the first to leave and the last to come back in inclement weather. One witness testified that there was a problem with Turnkey's extension cords lying in water on the project, and several witnesses testified that the jobsite was littered with lumber, some even with nails in it, creating a hazard for other workmen.
In addition, there was much testimony that Turnkey delayed the project. Mr. Jim Prine, who replaced Mr. Lovelace as supervisor for the project in 1972, testified that the electrical, plumbing, sheet metal, roofing and concrete trades were delayed by Turnkey. According to Mr. Prine, Gibson was uncooperative in working on the project. Mr. Saucier testified that the electric subcontractor repeatedly complained about Turnkey's delays and uncooperativeness. Although Mr. Doyle Bell, who had worked for Turnkey on the project, testified that there were problems with obtaining materials and that roads were bad on the project and that this attributed to the delay, Mr. LeBlanc testified that in the amount of time Turnkey had to complete the project under normal conditions, 85% of the project should have been completed. The obligation not to delay other crafts is an affirmative one under Turnkey's contract as well as an indication of unworkmanlike performance.
In brief, plaintiff also alleges certain damages were incurred by it due to the nonperformance of a separate contract by Turnkey to provide masonry work. It alleges that a slip of paper signed by John Gibson and introduced into evidence constituted a binding contract notwithstanding an agreement to later reduce it to a prepared written form. Plaintiff has not sustained its burden of proof on this issue. It is encumbent upon a party asserting validity of a contract to prove the existence of such. Walters v. Edwards, 212 So.2d 749 *450 (La.App. 1st Cir. 1968). Likewise, we reject the plaintiff's claim that certain damages to material were due to the fault of defendants. No negligence has been shown on the part of defendants in this regard, and there has been no proof of a contract of deposit.
Finally, defendants allege that Mr. Saucier's motives in filing this suit are questionable. They allege that Mr. Saucier possessed a "hate list" on which Mr. Gibson's name appeared and that he requested a union representative to bomb Mr. Gibson. However, these allegations stem only from the testimony of Mrs. Saucier, Mr. R. L. Saucier's wife. She, however, at the time of the suit was judicially separated from him. We accord no weight to her testimony.
We find therefore that defendants did breach the contract they entered into with North American Contracting Corporation by ceasing to perform under the contract, by failure to perform in a workmanlike manner, and by delaying the project. Thus, they are answerable to plaintiff in damages.
Under LSA-C.C. Article 2769, if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he agrees to do it, he is liable in damages for the losses that ensue from his noncompliance with his contract. See also LSA-C.C. Article 1930. The damages due for the breach of contract are subject to certain codal restrictions, the amount of the loss sustained and the profit of which the party has been deprived. In general then, the measure of damages for breach of a contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled. Harelson v. Parish of East Baton Rouge, 272 So.2d 382 (La.App. 1st Cir. 1972). The amount of damages must, however, be determined in relation to the contract and the circumstances which surround it. Jolley Elevator Company v. Schwegmann Bros. Giant Supermarkets, 230 So.2d 640 (La.App. 4th Cir. 1970). Generally, the damage attributable to a defect resulting from poor workmanship is the amount paid to remedy that defect. Cooperative Cold Storage Builders, Inc. v. Arcadia Foods, Inc., 291 So.2d 403 (La.App. 4th Cir. 1974).
The instant contract provided for a total contract price of $84,432. Turnkey had already been paid $66,916.30 and had performed, according to Mr. LeBlanc, $49,875.56 worth of work. Although plaintiffs have attempted to prove that $81,042.42 was spent for union carpenters; $17,812.50 for a "college crew" for labor on the project; that workmen's compensation insurance was paid on these workers (which was an obligation of Turnkey under the original contract) in the amount of $3,851, and that $371.73 was paid for ice and saw filing on the job, we cannot say that the evidence preponderates that these amounts were actually expended.
These amounts alleged are based principally on the testimony of Mr. Saucier. With regard to the items claimed for carpentry labor to complete the contract, Mr. Saucier testified that after the defendant ceased work, he paid the sum of $473.61 for installing felt on some of the units. The checks issued in payment of this work each contained a deduction for FICA taxes withheld. However, the names of the payees on these checks do not appear in the FICA report introduced into evidence. This latter fact raises considerable doubt as to the authenticity of these reports, which reports are the only evidence to corroborate the statements by Mr. Saucier that he expended the sum of $81,042.42 for carpentry labor to complete the project. Additionally, the FICA reports contain nothing to show that the amounts stated to have been paid were in fact paid in connection with work performed on the Oriental Garden Apartment project. Mr. Saucier admits the possibility that such reports may contain amounts paid for labor other than carpentry labor.
*451 With regard to the amounts allegedly paid to a "college crew" for labor on the project, the checks purportedly issued for such work contain no notation as having been issued in payment of labor performed on this project. Many of the checks were issued to R. L. Saucier, III, and at least one was issued to Mrs. R. L. Saucier, III. None of these payees were carried on Saucier's FICA report for the period during which they allegedly worked.
All of the items for which Mr. Saucier claims to have expended funds for completion of the project should have been more fully corroborated. Considering the evidence before us, we are unable to conclude that plaintiff has proved the amount of damages which he claims by a preponderance of the evidence.
However, plaintiff's demands will not be rejected merely because he cannot establish exactly the amount in which he is damaged. Under these circumstances, the court must fix the quantum as best it can. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971) and cases cited therein.
Having found that plaintiff has a legal right to recover, we hold damages should be fixed on the following basis:

Amount actually paid to defendants
under the contract $66,916.30
Less amount of work actually performed
by defendants under the contract
as per report of plaintiff's expert 49,875.56
 __________
Actual overpayment 17,040.74
Actual overpayment
Original contract price $84,432.00
Less amount of work actually performed
when defendants pulled off job 49,875.56
 __________
Amount required to complete job 34,556.44
Amount to which plaintiffs are entitled,
which includes $17,040.74 over
payment and $34,556.44 to complete
job $51,597.18
 ==========

The only other question in the case is whether only Turnkey is liable in its corporate capacity or whether, on the other hand, John Gibson and Jerry German are also liable in their individual capacities. The record shows that the contract was entered into on September 10, 1971. Turnkey Constructors, Inc. was not incorporated until October 27, 1971. The contract was entered into in the name of Turnkey Constructors, Inc. and was signed by John Gibson and Jerry German. We are presented then with the situation of agents signing a contract for a nonexistent principal. The situation is not that of an undisclosed agency relationship as plaintiff's counsel suggests. Where an agent acts for a nonexistent principal, he becomes personally liable. LSA-C.C. Articles 3010, 3012 and 3013. The corporation, Turnkey Constructors, Inc., having recognized the validity and accepted the benefits of the contract, is also liable since it is estopped to deny its corporate existence at the time the contract was entered into. Oliver v. Home Service Ice Company, 161 So. 766 (La.App.2d Cir. 1935).
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, North American Contracting Corporation, and against the defendants, Turnkey Constructors, Inc., John Gibson and Jerry German, individually, and in solido for the sum of $51,597.18, together with legal interest thereon from date of judicial demand until paid. All costs of these proceedings in both the trial and appellate courts are assessed against the defendants-appellees.
Reversed and rendered.