Jack AUSTIN, d/b/a Jack Austin & Associates, Plaintiff-Appellee Cross Appellant,

v.

D. R. PARKER and J. A. McAlpin, d/b/a M&M Construction Co., et al., Defendants-Appellants Cross Appellees.

No. 79–2948.

United States Court of Appeals, Fifth Circuit.*
Unit A

April 8, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Michael S. Fawer, Matthew H. Greenbaum, New Orleans, La., for defendants-appellants cross appellees.

Stockwell, Sievert & Viccellio, Emmett C. Sole, Lake Charles, La., for plaintiff-appellee cross appellant.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This diversity appeal presents a number of factual issues as well as questions of contract law for our decision. Although we affirm many of the findings and conclusions of the distinguished trial judge, we find that he erred in a few respects, and so we remand for reconsideration to that extent.

## I. *Facts*

In April, 1972, Jack Austin contracted with the U.S. Army Corps of Engineers to construct an 88-building, 260-unit family housing project at Fort Polk, Louisiana, for the sum of $5,746,830. Austin, an Oklahoma City, Oklahoma contractor, had extensive experience in the construction business and had acted as prime contractor on many large construction projects.

This housing project was situated in the middle of a dense pine forest, approximately one mile from the base. Because of its location, the job necessitated significant site work and preparation by a subcontractor, including general excavation and pouring of concrete slabs, curbs and gutters. No source of electricity existed at the site, a point which has engendered substantial controversy.

Austin initially contemplated having his own people perform the rough carpentry, i.e. the framing on the buildings. In early 1972, D. R. Parker approached Austin with an offer to do that work. Parker possessed considerable experience in the construction industry but relatively little experience as a subcontractor. For some time prior to contacting Austin, he had pondered using an automated, computer tape controlled framing machine for subcontracting carpentry work. In January 1972, he offered to purchase such a machine from General Construction Automation. Not long afterwards, he and James McAlpin, a home builder along the Mississippi coast, decided to pool their resources in order to bid on certain construction projects, using the automated framing machine. Parker and McAlpin eventually worked together on three projects: one in Norfolk, Virginia, one at Keesler Air Force Base, and this one at Fort Polk.

Parker arranged to show a film portraying the operations and advantages of the prefab machine to Austin. His Madison Avenue approach so impressed Austin that he arranged for Parker to show it to members of the Corps of Engineers, who would have to approve the subcontracting, as it would result in Austin's own employees' performing less than 25% of the work, a minimum required by the prime contract. The Corps, too, was impressed and agreed to the arrangement. The prefab machine would largely have obviated the problem of a scarcity of skilled carpenters in the Fort Polk area.

Parker and McAlpin then discussed their bid with Austin. Parker stated that with the prefab machine they would only need about 45 people to complete the job. As he boasted he could "build at least a building every day, every shift", it would require between five and six months.

Parker gave Austin an estimated price $486,011 for the subcontracting, based, significantly, not on the cost of using the prefab machine but rather on the cost of stick-building (with electric-powered hand tools) the entire project. Parker explained that he preferred to rely upon this conservative approach rather than to depend upon a money-saving mechanism that had not yet been proven. Austin's calculations for his own workers had produced an estimated price some $40,000 higher.

Although impressed with the automation, Austin observed that the prefab machine would require significant electric power, and electric power was one commodity in very short supply at the job site. Although the contract obligated him to run a transmission line from the post to the project, it would be some time before he installed the line. Austin told Parker that if he and his people worked as fast as they asserted, they would have completed half or more of the work before Austin could get any electricity to the area. Parker, no doubt anxious to secure the contractual plum, reiterated that this lack would not cause a big problem. In fact, he told Austin, he had generator sets he would bring to the cite to power the equipment. The record shows that other subcontractors provided their own sources of electricity.

Austin, Parker and McAlpin and representatives of the Corps of Engineers held several meetings during the spring about the framing work. In early June 1972, Austin, and D. R. Parker Co. and J. A. McAlpin d/b/a M&M Construction Co. (collectively M&M) agreed upon the price, scope of work, and other relevant details. Following the Corps' approval, Austin sent a standard subcontract form to Parker and McAlpin.

M&M then set out to gather a crew of experienced carpenters in the Gulfport, Mississippi area, which would form the nucleus of the workforce; remaining needs they would fill locally. Parker advised Austin that he intended to man the job with between 30–35 men and that with the machine in full swing, 26–30 would suffice. By the end of June, M&M had formed a crew, expecting to begin work on or about July 4. Parker was in charge of all administrative matters, while McAlpin would run the job with Dan Boyce as his assistant.

Due to other subcontractors' construction delays, M&M did not report until about July 24. A labor disturbance interrupted work the following week, so M&M did not really settle in until August 7.

During the slowdown, Austin and McAlpin discussed the electricity problem yet again. Their recollections differ. Austin testified that he told McAlpin categorically that M&M would have to supply its own source of power, but McAlpin denies that interpretation.

Austin made the first disbursement to M&M promptly and in full. He refused to make any more payments until M&M secured a performance bond, a pre-requisite for the written contract.

During the month of August, Austin several times asked Parker about the bond. Each time, Parker told Austin that he would have it in a few days. Toward the end of the month, Parker admitted to Austin that he was having trouble securing a

bond. His bonding company could not write a bond in excess of $250,000 per project. Dan Cohen, the Miami, Florida representative of International Surety Underwriters, Inc. (ISU), agent for Parliament Insurance Co. of Chicago, Illinois, suggested that they write two bonds and separate the single contract into two contracts. Austin, Parker and McAlpin agreed to split the contract in two, with one contract of $250,000 and one of $236,011. The split divided the buildings into two groups according to their schedule of completion, to conform to the total amount of each bond. Of 88 buildings, the first 47 fell within the $250,000 contract, the remaining 41 in the $236,011 contract. By accident, two buildings, number 87 and 66 were omitted altogether. Austin, noticing the omission, added the two to the end of the $236,011 contract. Building 87, in fact, properly belonged in the other contract.

Parker's insurance agent told Austin that he had authority to write two bonds to secure two such contracts. Austin's attorney in Oklahoma City advised that that proposal was satisfactory. Some technical details delayed effectiveness until about September 8.

Then another problem arose. Parker and McAlpin complained to Austin of materials shortages that, they claimed, impeded their progress. Of the 20 buildings that M&M worked on, half could not be completed in one continuous process [1] because of a lack of windows, exterior doors, cornice material, blackboard, siding, four by fours, two by tens, column supports, soffit, soffit trim, and frieze board. By letter of September 17, Parker brought the problem to Austin's attention. Austin acknowledged that some materials arrived behind schedule, but, having timely submitted his orders, denied responsibility. In a letter of November 25, he

also countered that Parker never gave specifics about the shortages, despite frequent requests, and added that even after late materials arrived, they sat, unused, for weeks.

While Parker complained about the lack of materials, Austin counter-complained about what M&M did with the materials they had. Poor quality workmanship was endemic to this project. The organization and quality of workmanship of M&M's forces was "very poor", according to the testimony of two engineers with the Corps. Austin continually found it necessary to inform M&M of its poor workmanship.[2] Indeed, Parker, tacitly acknowledging the poor quality of some of the work, relieved McAlpin of "all *direct* responsibility on [the] framing contract" and brought in a new man, Jack Williams to "straighten this job out."

The much-heralded and ballyhooed automated prefab machine in fact never was used. Work proceeded instead by the stick-building method, using about 15 carpenters from Mississippi supplemented by local labor.

By the end of October, the generators supplying power for M&M's employees were burning out at a rapid rate, and some 30 men were involved in costly "backending", i.e., going back to finish or repair work on buildings that they had worked on previously. M&M alleged that the backending resulted from materials shortages; Austin responded that M&M's poor workmanship necessitated much patching and repairing before the work was satisfactory, and that this backending—for the cost of which he, of course, was not liable—was the source of M&M's financial difficulties.

1. The project was conducted according to the Critical Path Method (CPM), a method of construction that allegedly results in the most efficient distribution and use of labor and materials to complete the job. Austin had stated from the beginning that he would employ the CPM and that his subcontractors would be obligated to follow it as well. The CPM made no reference to temporary electricity.

2. In a letter dated October 9, 1972, to Parker and McAlpin, Austin said, "Your workmanship in every phase of this job is so poor that it is doubtful to me that we can ever sell it to the government." He elaborated in several paragraphs on problems that he had encountered with the defendants' work.

M&M's payroll for the week ending November 3, 1972, showed 46 employees working on the project, of whom no more than 15 were skilled carpenters from Mississippi; the rest were local, unskilled laborers. On November 6, Parker told Jack Williams to cut his work force to 18 men because, facing the materials shortages and the financial drain of backending, he could not afford to go on. Austin, abroad for a European vacation, could not take any action, and his son Bobby Jack and Ernest Mann, the field superintendent, both disclaimed any power to deal with the problem.

Austin's assistant, Ken Hunter, on November 7 sent both a telegram and a confirming letter by registered mail to M&M advising that it had 48 hours to get the job properly manned or Austin would take action under paragraph 10 of the subcontract(s).[3] On Wednesday, November 8, M&M still had the same number of employees working. On Thursday, November 9, M&M paid off all its employees, abandoned the work and left the job site. That same day, Hunter formally notified Parker[4] that Austin was taking over the rough carpentry work.[5]

With M&M now out of the picture, attention shifted to the surety. Austin mailed copies of its notices to ISU, Parliament's agent in Miami, which wrote the bonds. Both before and after November 9, Parliament was informed of M&M's problems and, ultimately, its abandonment of the work at Fort Polk. Parliament was silent. Austin subsequently called upon them to review the situation, his claim for completion costs, and the work to be performed, or to suggest some alternative courses of action by which he could complete the framing. Parliament never even responded.

Parker, McAlpin and Austin subsequently had telephone conversations with Cohen of ISU in Miami, who also notified Parliament of the problem at Fort Polk. Parliament, apparently believing that it could wish the difficulties away, still took no action. On January 23, 1973, Austin's counsel again notified Parliament and ISU and advised them that he would commence legal action unless Parliament acted.[6]

**3.** Telegram to Parker and McAlpin d/b/a M&M Construction Company of November 7: "Gentlemen due to the fact that your phase of the job progress is in arrears and that you have failed to comply with our numerous requests to furnish a sufficient and responsible work force, you are hereby given a 48-hour notice to get this job properly manned or we will be forced to take action as per paragraph 10 of your subcontract."

**4.** Telegram to Parker and McAlpin d/b/a M&M Construction Company of November 9: "Gentlemen: as of 7 a. m. November 9, 1972 you have no workmen at all on this project. Due to the fact you have failed to comply with our request of November 7, 1972, to furnish a sufficient and responsible work force, this is to inform you that we are proceeding to take action as per paragraph 10 of your subcontract."

**5.** Ten: Should the Subcontractor, at any time, refuse or neglect to supply sufficient skilled workmen or material of proper quality or become insolvent, or refuse to follow plans and specifications, or fail in any respect to prosecute the covenant on its part to be performed, the Contractor shall have the right, after two days' written notice to the Subcontractor or to anyone representing the Subcontractor in the performance of the work, to terminate this contract in whole or in part. In that event, the Contractor shall provide the necessary material, labor, etc., to complete the contract in whole or in part and charge the cost thereof to the Subcontractor, crediting or debiting his account as the case may be when the work under this contract is fully completed and accepted by the Architect and/or Engineer. The Subcontractor expressly agrees to accept and to abide by the above clause in this connection and further agrees that such termination of contract shall not be made the basis of any legal action to secure additional compensation or damages, but nothing herein shall affect the right of the Contractor to recover damages from the Subcontractor for delay or mal-performance or non-performance of this contract. In the event of any termination of this contract, the Contractor may take over any of the Subcontractor's outstanding subcontracts and purchase orders and take possession of all the tools, equipment, scaffolding, materials and supplies of the Subcontractor which are on, in transit to, or connected with, said work for use in the completion of this contract.

**6.** Letter of January 23, 1973 from James R. St. Dizier, Austin's attorney, to Parliament Insurance Company in Chicago: "As you know, your principal abandoned these jobs on or about November 9, 1972, and, in spite of sever-

In fact, Parliament's first action was its filing of responsive pleadings in the District Court.

## II. *Proceedings Below*

Austin brought suit in the Western District of Louisiana, basing jurisdiction on diversity of citizenship of the parties. He charged Parker and McAlpin d/b/a M&M with breach of the contract(s) and sought damages of $436,011 (together with attorney's fees and penalties) from Parliament by virtue of the performance bonds. Parker and McAlpin counterclaimed for $300,-000 in damages for Austin's constructive termination of the contract.

Trial commenced on November 14, 1977, before Judge Hunter and proceeded intermittently for some eight months. He entered judgment for Austin and dismissed M&M's counterclaims. Parker, McAlpin and Parliament appealed the decision on the contractual claim and on their counterclaims. Austin appeals the findings on "renunciation" of the "second" contract and on attorney's fees and damages.

## III. *Issues on Appeal*

The parties have challenged virtually every finding of fact and conclusion of law that Judge Hunter made. Accordingly, even to enumerate the issues on appeal proves a not insubstantial task. We understand the issues to be: (i) whether there were two contracts or one; (ii) whether M&M abandoned and defaulted or whether Austin's omissions, regarding materials and electricity, constituted a prior material breach; (iii) *if* there were two contracts, whether Parker made and Austin accepted a renunciation of the $236,011 contract; (iv) whether the Judge correctly divided attorneys' fees in half; (v) whether the Judge correctly calculated damages; and (vi) whether Parliament Insurance Co. is liable for penalties and attorneys' fees.

### A. *Scope of Review*

We begin with the familiar notion that, in reviewing the factual findings of a District Judge, we may only set aside such findings if "clearly erroneous". F.R.Civ.P. 52; *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Williamson v. Brown,* 646 F.2d 196 (5th Cir. 1981). Ours is not to reason why: If the record provides support for the trial judge's findings, we may not disturb them on appeal even though we might take a different view. Especially in a case that stretched over a period of months and involved thousands of pages of transcript, it defies logic no less than common sense to think that the Court of Appeals can somehow improve upon the trial judge's actions. With that lesson in mind, we move on to the issues for our consideration.

### B. *Contract(s)? One for All and All for One*

The District Court held that there were two separate contracts between Austin and M&M and assessed liability on that basis. Here the District Court erred. Although two separate pieces of paper appear as exhibits, the record establishes that Austin, Parker and McAlpin in June 1972 agreed to *one* contract for framing work. Only after ISU's agent in late August 1972 said he could not write a performance bond for over $250,000 did the parties consider dividing the contracted-for buildings into two groups. We cannot accept the notion that the parties intended to enter into two separate agreements. If M&M or Austin breached after completion of the first set of buildings, in no way would that failure be independent of the $250,000 contract. It was all one and the same transaction, packaged so as to meet ISU's requirements.

---

al demands which our client has made, you have not complied with the obligations imposed upon you in these bonds, as well as under the laws of the State of Louisiana. It has been necessary for our client to perform all work called for in these subcontracts and at this time, it would appear that the subcontracts are less than 35% complete, but they are being performed by Jack Austin and Associates. The net loss to our client at this time approximates $100,000 and it is contemplated that the loss will be substantially greater before the jobs are complete. There are serious delay penalties in the general contract, so time is an important factor in this matter."

It follows that the District Court erred in concluding that both parties repudiated the "second" contract. Moreover, as the parties have pointed out, such a repudiation under Louisiana law requires mutual consent, *Prisock v. Boyd*, 199 So.2d 373, 376 (La.App.2d Cir. 1967); *Brooks v. Griggs Casing Crews Inc.*, 136 So.2d 693, 969 (La. App.2d Cir. 1961); LSA–C.C.Arts 1901,[7] 1945,[8] 2130;[9] and consideration, *Restatement 2d Contracts* § 273.[10] Austin emphatically never assented to such a move.

## C. Breach of Contract Materials

The District Court found that Austin had no obligation to supply electricity to the subcontractors and stated that Parker and McAlpin failed to carry their burden of proof that materials shortages proximately caused them to terminate the contract. Rather, it determined, Austin terminated the contract for M&M's failure adequately to man the job. While the deficiencies on Austin's part "were an inconvenience,

[they] did not seriously impair any of the other subcontractors' work."

We agree. Although the record does contain support for M&M's complaints, we cannot term the District Court's factual finding "clearly erroneous". That same record establishes that M&M was poorly organized, did shoddy work, and even with materials on hand ran behind schedule. In some instances, Austin had ordered *and received* articles *prior to* Parker's complaints. He argues persuasively that M&M's disorganization more than anything else caused whatever shortages in fact occurred. Such facts undercut M&M's argument that Austin failed to provide the materials it needed on time and that such failure, in effect, "drove" M&M off the site.

### Electricity

The District Court also refused to accept M&M's claim that Austin breached the contract by failing to provide an adequate source of electricity. Judge Hunter

---

**7.** Binding effect of agreements between parties

Agreements legally entered into have the effect of laws on those who have formed them.

They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

They must be performed with good faith.

**8.** Interpretation according to intent of the parties

Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

*First*—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;

*Second*—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;

*Third*—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

*Fourth*—That it is the common intent of the parties—that is, the intention of all—that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.

**9.** Art. 2130. Methods of extinguishment
Art. 2130. Obligations are extinguished:
By payment.
By novation.
By voluntary remission.
By compensation.
By confusion.
By the loss of the thing.
By nullity or rescission.
By the effect of the dissolving condition, which has been explained in the preceding chapter.
By prescription, which shall be treated of in a subsequent title.

**10.** Except as [otherwise] stated ... an obligee's manifestation of assent to a discharge is not effective unless

(a) it is made for consideration,

(b) it is made in circumstances in which a promise would be enforceable without consideration,

(c) it has induced such action or forbearance as would make a promise enforceable.

The Comment to this section explains: "This section states the traditional requirement of consideration or one of its substitutes in order that the obligee's assent to even a present discharge be effective. The requirement is analogous to that of consideration or some substitute in order that even a present transfer of a right by assignment be irrevocable.... Subject to some exceptions, *a gratuitous discharge is not effective*, just as a gratuitous promise is not enforceable and a gratuitous assignment is not irrevocable.

felt compelled to decide the point, he observed, because "I think it would be my obligation to make that finding. . . . and the reason I think it would be my obligation is because, if I felt it were irrelevant, the Court of Appeals might not." We congratulate the Judge on his foresight and affirm his conclusion.

The primary contract between Austin and the Corps of Engineers stated:

"9. AVAILABILITY AND USE OF UTILITY SERVICES (1967 APR).

(a) The *Government will make available to the Contractor, from existing outlets and supplies,* all reasonably required amounts of utilities as specified in the Schedule or specifications. Except as otherwise provided in the Schedule or specifications, each utility shall be charged to or paid for by the Contractor at prevailing rates charged to the Government or, where the utility is produced by the Government, at reasonable rates as determined by the Contracting Officer.

(b) The Contractor shall carefully conserve utilities furnished without charge. The Contractor, at his own expense and in a workmanlike manner satisfactory to the Contracting Officer, shall install and maintain all necessary temporary connections and distribution lines and, if necessary to determine charges, all meters required to measure the amount of each utility used; and he shall remove the same prior to final acceptance of the construction. (ASPR 7–603.30)

"10. PAYMENT FOR UTILITY SERVICES

Water, gas, and electricity are available from Government-owned and operated systems and will be furnished without charge to the Contractor."

It seems clear that this provision in no way obligated Austin or the Corps to transmit electricity to the site.

The contract between Austin, Parker and McAlpin stated:

Sixteen: It is agreed that *should* the Subcontractor use the contractor's hoist, mixer, or any other equipment, or ice water, gas, electricity, water, etc., an agreed price in writing must be made before such use, with the contractor's superintendent or settle strictly by the Contractor's charge.

(emphasis added) We draw attention to the use of the conditional verb "should". "Should" in this sense means *if*—if the subcontractor uses electricity, then he must pay. That clause does not mean, as Parker and McAlpin would have us believe, that Austin thus became obligated to supply electricity to the site.

McAlpin conceded that Austin had never said he would supply electricity.[11] Rather, the M&M principals inferred such a promise from the specifications but, we think, erred in their interpretation.

Parker admitted that he reported for work on July 24, 1972 with gas powered air compressors to drive his nailing equipment. Obviously, M&M recognized the lack of temporary electricity and came prepared. Both Shannon Foreman of Alco Co. and J. A. Honeycutt, another subcontractor, testified that they too provided their own temporary electric power. In the light of these facts, we cannot accept M&M's argument that the lack of power came as a surprise.

---

11. "BY MR. SOLE:
   "Q. Was it specifically stated to you by Mr. Austin that he would supply you with temporary power?
   "A. At the time we initially bid the job and everything, it was understood, and we didn't know until we was ready to move out on the job site that the power was going to be delayed getting into the site.
   "THE COURT: Sir, answer the question. The question was, did Mr. Austin specifically tell you that he would furnish you power?

"THE WITNESS: No, sir. The specifications, when we were bidding on the job, which I read, said that the government would put the power on the job site and Mr. Austin would take it from that point and he could disburse it out—I think Mr. Austin did say we would prorate the bill amongst the contractors in accordance with what they used it."

■ M&M refers us to testimony of Bertram Warshaw, a construction engineer, that Austin's failure to supply electricity breached a local industry custom. When a contract is ambiguous or silent on a point, evidence of local custom and usage may be introduced to explain or interpret the contract. *Fontenot's Rice Drier, Inc. v. Farmers Rice Milling Co.*, 329 So.2d 494, 498 (La.App.3d Cir. 1976), *writ ref'd.*, 333 So.2d 239 (La.1976); *Velasquez v. Custom Built Homes*, 246 So.2d 699 (La.App. 4th Cir. 1971); *Terrell v. Alexandria Auto Co.*, 12 La.App. 625, 125 So. 757 (2d Cir. 1929); *Restatement 2d Contracts* § 222. Here we believe the contract clause, although not, perhaps, as specific as we might hope, refutes the suggestion that *Austin* had to supply electricity. Thus we do not consider Warshaw's testimony.

■ Even assuming that Austin had such a duty under local custom, we find that Parker and McAlpin waived their grievance by continuing at the job using their own generators. As this court pointed out in *Autrey v. Williams & Dunlap*, 343 F.2d 730, 736–7 (5th Cir. 1965), where a subcontractor continues work after a possible breach of contract by the general contractor,

> "The principle is general that when a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, 5 Williston, Contracts § 688, at 300 [3d ed. 1961], unless the right to retain the excuse is not only asserted but assented to,

ibid; see *Louisiana Highway Comm. v. Farnsworth*, 5 Cir. 1935, 74 F.2d 910, 913–14 [Road contractor's rights from failure to receive partial payment reserved and recognized before resuming work]. Thus, assuming that the prime contractor failed to prepare the site, to furnish materials and to supervise and coordinate the work, the plaintiffs elected to continue their respective contracts. See 5 Williston, Contracts § 683, at 270 [3d ed. 1961]." [343 F.2d 730, 736–37]

*See also Cities Service Helex, Inc. v. United States*, 543 F.2d 1306 (Ct.Cl.1976). We uphold the District Court's conclusion that Austin's alleged failure to supply electricity and to furnish materials on time did not constitute a material breach of the contract.[12]

Having concluded that Austin breached no contractual obligations, we turn now to the actions of M&M on November 6–9, 1972. On November 6, facing a financial crunch, Parker ordered Williams to cut the work force to 18 men. Austin the next day demanded that M&M bring the number of men back up to par or he would take action under paragraph 10 of the contract.[13] M&M abandoned the site altogether on November 9, and Austin properly notified Parker that he regarded that action as a breach and would take over the framing work himself.

■ Lacking a legally sufficient reason to abandon the job, M&M breached its contract with Austin on November 9 when it

---

12. *See* J. Calamari and J. Perillo, *Contracts* (2d Ed. 1977) at 397: Generally speaking, if the plaintiff claims that he has performed, the issue is his substantial performance, but if he claims he has not performed because of a breach by the defendant, the issue is whether the defendant is guilty of a material breach or repudiation. The same authors continue: There is no simple test to ascertain whether a breach is material. Among the factors to be considered are:
1) To what extent, if any, the contract has been performed at the time of the breach. The earlier the breach the more likely it will be regarded as material.

2) A willful breach is more likely to be regarded as material than as a breach caused by negligence or by extraneous circumstances.
3) A quantitatively serious breach is more likely to be considered material.... materiality of breach is ordinarily a question of fact.
Id. at 408–9. *See also* 4 *Corbin on Contracts* § 946; *Restatement 2d Contracts* § 241.

13. "If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."

withdrew its employees from the site.[14] The District Court so held, and we agree. When Austin's man Hunter asked why M&M had left, Williams responded, "I thought you knew, we are out of money." Where a subcontractor, having begun work under a contract, abandons a job, he defaults. *Al Smith's Plumbing v. River Crest, Inc.*, 365 So.2d 1122, 1124–5 (La.App. 4th Cir. 1978), *Campbell Construction Co. v. Barnhill Brothers, Inc.*, 245 So.2d 776, 779 (La.App. 2d Cir. 1970). Once M&M left the job site, Austin properly could regard the contract as breached and take whatever actions were necessary to insure timely completion of the construction. *See* 11 Williston on Contracts § 1301–1303; 4 *Corbin on Contracts* § 983; J. Calamari and J. Perillo, *Contracts*, § 1210.

### D.   Attorneys' Fees

■ The District Court accepted Austin's statement of attorneys' fees incurred in the case but, given its conclusion that Austin and M&M renounced the second contract, proceeded to split the fees in half. Paragraph 20 of the contract states:

> 20. * * * The subcontractor further agrees to pay to the contractor the amount of expenses and attorney's fees incurred by the contractor because of any default of the subcontractor in the performance of the work or in the payment of labor and/or material bills or arising from the filing of claims with the contractor for such bills.

We have concluded that there was but one contract and that M&M breached that contract when it withdrew its workforce from the job site in November 1972. The breach constitutes a "default of the Subcontractor in the performance of the work" so as to make Paragraph 20 applicable. From our view of the case it follows that the District Court erred in halving the attorneys' fees. Austin is entitled to receive the entire amount of his attorneys' fees, $81,110.50, as of April 20, 1979.

■ We totally reject Parker and McAlpin's claim that Austin did not precisely prove the amount of attorneys' fees. This trial spanned an 8-month period. During 16 days of trial, Austin called 11 witnesses. The transcript, alas, runs to more than 3400 pages; Austin offered in evidence more than 110 exhibits. A post-trial brief, reply brief and a supplemental reply brief added extra weight to justice's scale. Austin's counsel, Mr. Sole, furnished an affidavit explaining the total number of hours billed and the hourly rates. As appellant's counsel conceded at oral argument, he had an opportunity to look over counsel's log books, which detailed all of the charges, in Mr. Sole's office. In such circumstances, responsible counsel should not waste this court's time with such petty quibbling. The legal profession, like Shakespeare's Julius Caesar, is an honorable one, is it not? We amend the District Court's judgment to allow Austin to recover full attorneys' fees.

### E.   By Act of Parliament

■ Under Louisiana law, attorneys' fees may not be awarded as damages in breach of contract actions unless the contract or a specific statute authorizes such an award. *National Union Indemnity Co. v. R. O. Davis, Inc.*, 393 F.2d 897 (5th Cir. 1968); *Breaux v. Simon*, 235 La. 453, 104 So.2d 168 (1958). Parliament argues that its contract with Austin does not cover such fees and that the District Court erred in its award. We disagree. The contract between Austin, Parker and McAlpin explicitly awards attorneys' fees in the event the subcontractor breaches, *see supra* at 518. We accept the District Court's finding that "the bonds refer to the subcontracts and must be construed together" and affirm the award of attorneys' fees under the contract.

■ It appears possible that Austin's recovery may equal or exceed the amount of

---

**14.** LSA–C.C.Art. 2769 provides:
Contractor's liability for non-compliance with contract
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.

the bonds before making provision for attorneys' fees. As an alternative, LSA–R.S. § 22:658 [15] affords Austin a means of securing payment of its not insubstantial attorneys' fees.

Section 22:658 imposes the cost of attorneys' fees upon an insurer that arbitrarily, capriciously or without probable cause fails to pay a demonstrated loss. We have held that it applies to various types of bonds. *Howard, Weil, Labouisse, Fredricks v. Insurance Company of North America*, 557 F.2d 1055 (5th Cir. 1977) (broker's blanket bond); *National Bank of Commerce in New Orleans v. Fidelity & Casualty Company of New York*, 312 F.Supp. 71 (E.D.La.1970), *aff'd.*, 437 F.2d 96 (5th Cir.), *cert. den.*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971) (banker's blanket bond). A surety bond is an insurance contract, LSA–R.S. § 22:6(8).[16] Although we find no cases on point, it seems that a surety contract, like other insurance policies, must fall within the coverage of § 22:658.

█ The District Court denied Austin the penalties and attorneys' fees for which § 22:658 makes provision because his notification of Parliament was not a sufficient "proof of loss". That factual finding, we think, was clearly erroneous. Let us review the facts. Austin, on November 9, 1972 sent a telegram to Parliament informing them of the abandonment and default. He subsequently wrote Cohen of ISU to tell him of the default. He sent weekly copies of the payroll to M&M, Parliament and ISU. In December, he received a request from Parliament to advise of the status of M&M's contractual obligation. Using Parliament's own status inquiry form, Austin promptly replied. Although he did not answer every question on the form, his response certainly gave Parliament notice of the claim against it. Austin never received any other proof of loss request from Parliament, but it never followed up on the one he sent, never contacted him or sent anyone to investigate the claim. In January 1973, Austin again contacted Parliament and threatened suit unless it took action. None followed.

The trial judge found that

When a compensated surety company has been clearly advised that its principal has abandoned the work and defaulted on the contracts secured as was the case here, it cannot be heard to complain that it was unaware of these facts and/or that the obligee had not properly notified it.

(2269) We agree and are puzzled by his failure to apply § 22:658 to Parliament's actions or lack thereof.

**15.** All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees.

**16.** Kinds of insurance

Insurance shall be classified and defined as follows:

. . . . .

(8) Fidelity and Surety. Becoming surety or guarantor for any person, co-partnership or corporation in any position or place of trust or as custodian of money or property, public or private; or, becoming a surety or guarantor for the performance of any person, co-partnership or corporation of any lawful obligation, undertaking, agreement or contract of any kind, except contracts or policies of insurance; or, guaranteeing against loss or damage resulting from failure of debtors to pay their obligations to the insured; and underwriting blanket bonds. Such obligations shall be known and treated as suretyship obligations and such business shall be known as surety business.

The bond requires "a written statement of the particular facts showing the date and nature of such default." Austin repeatedly notified Parliament and ISU of his problems and requested them to live up to their contractual agreement. The "proof of loss" form that Austin filled out also afforded Parliament notice that the subcontractor had not completed work and had abandoned the job site. We are at a loss to know what more Austin could have done to give Parliament the notice it now claims was defective.

■ Louisiana decisions demonstrate that "proof of loss" is a flexible requirement. An insurer of course must receive some kind of notice of a claim before it can act. So long as it receives enough information, the manner in which it obtains the information is immaterial. Courts have not imposed the same rigid notice requirements on an insured as they impose on a plaintiff seeking to bring a defendant within a court's jurisdiction, nor should they. Thus either written or oral demand, of an informal nature, satisfies § 22:658, so long as it informs the insurer of the situation and of the insured's intention to submit a claim.

In *Paul v. National American Insurance Co.*, 361 So.2d 1281 (La.App. 1st Cir.), *writ ref'd.*, 363 So.2d 1385 (La.1978), the Court upheld an award of penalties and attorneys' fees although the insured gave only an informal, oral notice of loss to his local insurance agent. The insurer, which dispatched an adjuster to inspect the scene of the fire and make a report, obviously had notice. The Court expressly found that the insured did not fail to cooperate or to furnish necessary materials and information, so he bore no blame for the delay. Responsibility fell, instead, upon the insurer:

> Notwithstanding the rule of strict construction applicable in cases of this nature, our jurisprudence establishes that the pertinent statute does not require written proof of loss, or any other formal style of proof; it is required only that the insurer have actual knowledge of the facts.... In this case, [insurer] was fully apprised of the claim through [its ad-juster's] personal investigation of the premises and the list of contents furnished by Insured.... [T]he delay in payment was not due to any fault of Insured.

361 So.2d at 1284. *See also Riverland Oil Mill v. Underwriters for Lloyd's*, 368 So.2d 156 (La.App. 2d Cir.), *writ ref'd.*, 369 So.2d 1365 (La.1979); *Wilkins v. Allstate Insurance Co.*, 173 So.2d 199 (La.App. 1st Cir. 1965).

■ In *Paul,* the insurer at least sent an adjuster to investigate the premises and to verify the claim of loss. Parliament did not fulfill even that basic obligation. It blithely did nothing despite Austin's repeated requests for it to carry out its contractual obligations. Those obligations, for a compensated construction surety, included a duty to ensure performance. We will not now hear Parliament to complain that it lacked sufficient notice and proof of Austin's loss. A simple telephone call or letter to Austin requesting further information would have resolved the matter. We remand to the District Court for the imposition of penalties and attorneys' fees (to the extent they exceed the amount of the bonds) under § 22:658.

### F. Damages

The District Court calculated Austin's damages in accordance with *North American Contracting Corp. v. Gibson*, 327 So.2d 444 (La.App. 3d Cir. 1975), *writ ref'd.*, 332 So.2d 280 (La.1976). There a carpentry subcontractor abandoned the job, alleging that the general contractor had failed to pay the "draws" due under the contract. The Court found that the contractor had overpaid the subcontractor, so that the subcontractor breached the contract when it pulled off the job. The contractor sought to recover completion expenses in excess of the contract price. The Court, finding a failure of proof as to these additional expenses, devised its own formula for determining damages. That formula was the difference between the actual contract price and the dollar value of the work performed by the subcontractor before it breached. 327 So.2d at 451.

Applying the same formula here, the District Court first subtracted from the contract price of $250,000 the $87,484 actually performed by M&M and then subtracted $23,494.60, the sum for uncompensated work from October 15 to November 7, 1972, leaving as total damages $137,021.40 on the "first" contract. Since the Court found that the parties renounced the "second" contract, it levied no damages, for that part of the work.

Both Austin and M&M challenged the Court's calculation and the formula on which it relied. M&M correctly observes that damages are limited to those reasonably foreseeable by the parties, LSA–C.C. Art. 1934,[17] but then incorrectly applies that maxim.[18]

Austin, relying upon LSA–C.C. Arts. 1934 and 2769,[19] states that the measure of damages is "the amount of loss he has sustained". He does not supply us with any formula by which to turn that innocuous phrase into a dollar amount. Austin alleges that he spent $1,053,132.32 to complete the framing work—a rather sizeable overcharge on a $486,000 contract. Damages, presumably, would be $1,053,132.32 reduced by the remainder budgeted on the M&M contract.

The trial court did not accept either version of damages. Rejecting Austin's claim, it found that he had not sufficiently proven his losses. It referred to a "litany of de-

fects inherent in [Austin's] method of proof" as justification. For example, although Austin kept separate payrolls, distinguishing between the cost to complete the framing work and other costs, he failed to record what percentage of that work covered repair of mistakes made by his own men. The payroll documents, the Court concluded, did not confirm the sizeable amount of damages that Austin claimed.

We believe that the trial court imposed too strenuous a burden upon Austin. While damages may not be speculative, *see Nat Harrison Associates, Inc. v. Gulf States Utilities Co.*, 491 F.2d 578, 587 (5th Cir. 1974), neither should the Court hesitate to use its equitable powers to draft the most accurate estimate possible, where the party reasonably establishes a loss. *Gibson, supra; Preston v. Chrysler Motor Companies*, 334 So.2d 486 (La.App. 1st Cir. 1976), *writ ref'd.*, 337 So.2d 877 (La.1977). Austin should not be denied recovery for expenses he legitimately incurred as a direct result of the breach—especially since Parliament never requested any type of record-keeping. M&M and Parliament have no one to blame but themselves. Austin every week mailed a copy of the payrolls to M&M, Parliament and ISU. Yet even after he filed suit, Parliament gave no instructions as to the maintenance of proper rec-

17. Measure of damages for breach of contract
  Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
  1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By *bad faith* in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.
  2. When the inexecution of the contract has proceeded from fraud or bad faith, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but also to such as are the immediate and direct consequence of the

breach of that contract; but even when there is fraud, the damages can not exceed this.

18. M&M applies that rule to Austin's internal estimate, made before he entered into the contract with M&M, and argues that since Austin thought the work would cost approximately $525,000, he could only recover (after subtracting the amounts actually expended, due or budgeted under the contract) $11,098. This fanciful formula misconstrues Art. 1934. Austin's internal calculations are, at best, irrelevant to this dispute.

19. Contractor's liability for non-compliance with contract
  If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.

ords. In an early case in this Circuit, we held:

> Appellants were required to prove their right to damages to a certainty, but damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient that there be proved a reasonable basis of computation, although the result may be only approximate. *A defendant whose wrongful act creates the difficulty is not entitled to complain that the amount of the damages cannot be accurately fixed.*

*Rynveld v. Dupuis,* 39 F.2d 399, 400 (5th Cir. 1930). Although the pages have yellowed, that case reflects modern notions of fairness and justice, and we approve of its rule.

In *Gibson,* the Court pointed out,

> [P]laintiff's demands will not be rejected merely because he cannot establish exactly the amount in which he is damaged. Under these circumstances, the Court must fix the quantum as best it can.

327 So.2d at 451; *See also Jordan v. Travelers Insurance Co.,* 257 La. 995, 245 So.2d 151 (1971) (Tate, J.) and cases cited.

Our reading of the Louisiana cases convinces us that Austin may recover for amounts spent to complete the work in excess of the contract price so long as he can prove them to the Court's satisfaction. In *Melancon v. Juno,* 337 So.2d 652, 653–54 (La.App. 4th Cir. 1976), the Court stated:

> But assuming he had no right to withdraw and therefore breached his contract, the liability would only extend to "the damages ... sustained by his default," C.C. 1930, i.e. the *reasonable cost of completing the contract in excess of the original contract price.*

In *Al Smith Plumbing, supra,* the Court found that the plaintiff had not proven its damage claim but added: "Had [records of the total costs to perform the job] been produced ... we would agree that Smith should be cast in judgment for loss of profit and *all other additional expenses....*" 365 So.2d at 1125–6. *See also Hamilton v. Goeders,* 121 So.2d 859 (La.App.2d Cir. 1960). The proper formula, therefore, is the *Gibson*

equation *plus* any extra, reasonable expenses attributable solely to M&M's shoddy workmanship or default which Austin can prove. *See generally* 5 Corbin on Contracts § 1089 *et seq.; Restatement 2d Contracts* §§ 347, 348, 350(2); Calamari and Perillo, *Contracts,* § 14–17. We therefore remand to the District Court for a second attempt at calculating Austin's damages. On remand, the Court should delve into Austin's payroll records and, with the parties' assistance, make a reasonable estimate of the additional expenses, if any, that resulted from M&M's breach of the contract.

## IV. *Conclusion*

To summarize, we hold that (i) the parties entered into but one contract, which (ii) M&M breached when it abandoned the job site, for which breach (iii) Austin may recover not only his *Gibson* damages but any reasonable additional expenses incurred in completing the job which result from M&M's breach, plus (iv) his full attorneys' fees and (v) statutory penalties from Parliament, the surety, pursuant to Louisiana law.

We retain jurisdiction so that if either party is dissatisfied with the District Court's determination of damages on remand, the matter can come back to this same panel. The District Judge shall file supplemental findings of fact and conclusions of law and certify them to this Court. That course will promote efficiency and spare three other members of this Court the task of wading through the thousands of pages of record that this dispute has engendered, is now engendering and, we fear, will engender in the future. The parties without further leave will have the opportunity to file supplemental briefs.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.