329 So.2d 494 (1976)
FONTENOT'S RICE DRIER, INC., Plaintiff and Appellant,
v.
FARMERS RICE MILLING COMPANY, INC., Defendant and Appellee.
No. 5367.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1976.
Rehearing Denied April 7, 1976.
Writ Refused June 2, 1976.
*495 Guillory, McGee & Mayeux, by Robert K. Guillory, Eunice, for plaintiff-appellant.
King & Ricketts, by Randall E. Ricketts, Lake Charles, for defendant-appellee.
Before CULPEPPER, DOMENGEAUX, and PAVY, JJ.
DOMENGEAUX, Judge.
Plaintiff-appellant, Fontenot's Rice Drier, Inc., instituted this action to recover a portion of the price due for the sale of a shipment of rice to the defendant-appellee, Farmers Rice Milling Company, Inc. Defendant raised the defense of compensation and filed a reconventional demand for damages resulting from a prior shipment of plaintiff's rice which was allegedly inferior. The trial judge found that defendant's plea of compensation was justified, and dismissed plaintiff's suit at his costs. From this judgment plaintiff has appealed.
On October 10, 1973, plaintiff entered into a contract with one Don Harrington, an agent of the defendant, whereby he sold a quantity of rice (6,500 barrels) to the *496 latter for the sum of $131,000.00. The written contract executed by the parties is reproduced as follows:

This document reveals that the parties agreed to the amount of 6,500 barrels with an estimated milling yield of "92-112", for a price of $20.20 per barrel. Furthermore the rice was to be stored free by the plaintiff and transported by the defendant no later than December 31, 1973. The rice was paid for on October 10, 1973, although defendant had not yet taken possession of the shipment and transported it to its mill.
The defendant mill began loading and shipping the rice on December 21, 1973, and completed this task on January 4, 1974. However, plaintiff did not object to this delay in removing the rice from his premises.
After the last of the rice involved in this sale was removed by the defendant, plaintiff contacted Harrington and informed him that he had a remaining quantity of 615.91 barrels at an estimated milling yield of 92-112 which he was willing to sell for the currently prevailing price of $24.40 per barrel. Harrington communicated this offer to the defendant who accepted and transported the rice to its milling facility. The record does not reveal the exact day on which the parties agreed upon the second sale, but the weight sheet attached to plaintiff's petition indicates a date of January 3, 1974.
After the passage of several days plaintiff contacted Harrington with an inquiry as to why he had not received payment for the second shipment of rice. Harrington told plaintiff that he would investigate the matter and that payment should be made within three or four days. Plaintiff waited several more days, did not receive payment, and contacted Harrington again. On this occasion Harrington informed the plaintiff that his payment would have to be decreased somewhat because the rice was of an inferior quality, however he failed to indicate the extent of the proposed reduction. The record indicates that, at this time, plaintiff was under the impression that this reference was to the second shipment of rice. After several days and no receipt of payment, plaintiff again called Harrington and this time spoke with his associate, a Mr. Guidry, who informed plaintiff that the mill was dissatisfied with the quality of the first shipment of rice and was therefore deducting an amount to compensate for its inferior quality from the payment for the second shipment of rice. This first notice to plaintiff concerning a complaint about the quality of *497 his rice (first shipment) was made approximately three to four weeks after the shipment was completed. Thereafter the "reduced" payment for the second shipment was not forthcoming, and plaintiff consulted his attorney who contacted the defendant concerning the transaction. On February 4, 1974, plaintiff received a check for $3,629.34 with a notation at the bottom of the check "In full payment of all amount due". The check was signed by Harrington.
Since plaintiff's bill for the second shipment of rice was in the amount of $15,459.34, he refused to accept this check with the above described notation and tendered it back to defendant who issued a second check for the same amount, but without the notation relative to accord and satisfaction.
Much evidence was adduced concerning the customary manner in which rice sales are transacted in this portion of south Louisiana. The testimony established the procedure to be as follows:
The sale of rice between a farmer (drier) and a mill is negotiated between a broker or intermediary, who usually acts as an agent of the buyer (mill). The parties agree upon a price based upon quantity and quality (estimated milling yield). Once the agreement is made the rice is transported by the mill within ten to fourteen days. Before each truckload of rice is unloaded, a sample is taken at the mill which is compared to an original sample which determined the sale quality. If the quality of the shipment is substantially equivalent to that of the agreed milling yield, the truck is unloaded, and the grain is milled. However, if the sample reveals a milling yield below that contemplated by the agreement, the mill contacts the seller who may then have his own sample made. If the parties agree that the shipment is yielding rice of a lower grade than that of the original sample and agreement, they attempt to renegotiate the price. If an impasse is reached either party then has the option to withdraw from the sale. However, if a new price can be agreed upon the remainder of the rice is unloaded, and the seller is paid. Customarily, the buyer does not receive payment until after the rice has been sampled and the estimated milling yield verified.
The trial judge found that the contract of sale between the parties to this litigation was unaffected by the prevailing custom in the area and industry for two reasons:
First, the price was paid before the buyer took actual delivery of the rice; and second, delivery was not taken for a period of approximately two and one-half months.
The applicable provisions of the Civil Code pertaining to custom and usage are as follows:
"Art. 1903. Extent of implied incidental obligations
The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect."
"Art. 1953. Usage controlling in case of ambiguity
Whatever is ambiguous is determined according to the usage of the country where the contract is made."
"Art. 1964. Incidents supplied by law, equity or usage
Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from one of these sources."
"Art. 1966. Usage as part of contract
By the word Usage mentioned in the preceding articles, is meant that which is generally practiced in affairs of the same nature with that which forms the subject of the contract.. . . ."
*498 When parties are insufficiently explicit in their contractual relations, the contract is binding, not only as to what is expressed therein, but also as to all consequences which equity, custom, or the law impose on an obligation according to its nature. Plainol, Traite Elementaire De Droit Civil, Volume 2, No. 1171.
From the same commentator comes the statement that:
"The clauses which are usual in a contract should be supplied although they are not expressed..... a contract is binding in all its clauses according to equity or usage." Volume 2, No. 1181.
In their work On Obligations in the Droit Civil Francais, Aubry and Rau tell us, at Section 346, that:
"Agreements bind not only with regard to matters formally expressed but also with regard to all consequences which according to equity, usage, or the law, must be considered as impliedly included."
The case of Velasquez v. Custom Built Homes, Inc., 246 So.2d 699 (La.App. 4th Cir. 1971) states that:
"In the absence of a specific contractual provision, custom will prevail."
See also Southern Bitulithic Company v. Algiers Ry. & Lighting Co., 130 La. 830, 58 So. 588 (1912), in which it was said that:
"Usage enters into every contract, and is properly admissible in evidence for the purpose not only of elucidating the contract, but also of completing it." (Emphasis added)
Custom may also be employed not only to modify or restrict a contract into which it enters, but also to enlarge that contract. Wray-Dickinson Company v. Commercial Credit Company, Inc., 192 So. 769 (La.App. 2nd Cir. 1939).
We also find the case of Terrell v. Alexandria Auto Company, Inc., 12 La.App. 625, 125 So. 757 (2nd Cir. 1930) applicable:
"In interpreting a contract not specific in its wording, it is necessary to take into consideration the custom of the place and the usual and customary manner of fulfilling like contracts in arriving at what was the reasonable expectation of the parties to the contract at the time it was made." (emphasis added).
If the parties make no specific agreement on a particular subject, custom will prevail in the case of controversy. Craton v. Miller, 47 So.2d 342 (La.App. 2nd Cir. 1950).
It is important to note that the customary deviations made in this case were initiated at the request of the defendant. The mill apparently purchased rice in excess of its own storage capacity, and therefore requested that plaintiff hold the rice, on their behalf, for an extraordinarily lengthy period (two and one-half months). Plaintiff agreed as a consideration to defendant, but obviously could not wait until delivery was taken to obtain his money. For that reason, payment was made in a manner which differed somewhat from the customary procedure.
We do not feel that the time of payment and length of storage in this case are aspects of the contract which necessarily negate the existence and application of custom and usage in the industry as to those portions of the agreement to which the parties were silent. Simply stated, there was a slight deviation made at the request of the buyer because it had obviously bought more rice than it could handle at any one time. The seller was merely trying to accommodate the mill by allowing it additional storage time. Early payment was made as a consideration for the seller's *499 willingness to extend the storage time. The parties to this contract were silent concerning the right of the seller to inspect the grain should alleged deficiencies occur, and we must look to the custom and usage in the rice industry to determine the tacit terms of the agreement as to that issue. Since the parties failed to expressly reject the application of the solidly entrenched and established custom of allowing the vendor an opportunity to inspect and negotiate relative to the matter of unattained estimated milling yields, we find that custom must enter into the contract and prevail in this controversy. Relying upon the abovementioned customary practices prevalent in the industry, we conclude that the defendant violated the tacit customary provisions of the contract in its failure to notify plaintiff of the alleged deficiencies. For that reason, we find that the defendant mill waived its right to complain about the quality of plaintiff's rice and thereby accepted it under the terms of the contract by unloading and milling the entire shipment without notifying plaintiff as to any alleged qualitative shortcomings.
We are also concerned about additional aspects of this case concerning the matter of set off and compensation.
One raising the plea of compensation is faced with the burden of proving the claim upon which his plea is based. Jackson v. Taylor Brothers Garage, 4 So. 2d 41 (La.App. 1st Cir. 1941).
According to the case of Hughes Realty Company, Inc. v. Pfister, 245 So.2d 757 (La.App. 4th Cir. 1971), the party claiming compensation:
". . . must prove by a preponderance of the evidence that the debt is for a certain amount or for an amount capable of ascertainment by mere calculation in accordance with accepted legal standards, and that it is the obligation of the party against whom the plea is urged." (Emphasis added).
We are of the opinion that the evidence produced by the defendant in support of its claim of compensation failed to provide a basis for the application of compensation.
None of the supposedly inferior rice was presented at the trial. Over plaintiff's objection, the manager of the defendant mill, Mr. Robertson, testified that one of his employees told him that some of the plaintiff's rice was not milling to the contractual quality. This individual who performed the actual evaluation of the rice did not testify nor was he even identified by name. Mr. Robertson never ran any actual tests himself, and he had no firsthad knowledge concerning the quality of the rice. Mr. Harrington, the defendant's agent, testified that a bag of rice was sent to him by the defendant for additional testing. This rice was represented to be a sample of the shipment received from the plaintiff. However, Harrington, like Robertson, had no personal knowledge that this rice actually came from the shipment in question. He testified that he merely sampled some rice which supposedly represented said shipment and found that it milled below quality. It is significant that plaintiff was never afforded an opportunity to have his own certified inspector sample the rice, nor was he given the right to have an independent evaluation made by federal rice inspectors. This litigation classically illustrates the purpose and function of the customary practice of affording the seller an opportunity to question the alleged deficiency of his product before the milling is conducted. All of the physical evidence in this case was, in effect, "destroyed" in that it was completely and totally milled before any independent sampling of the raw product could be made. Therefore, plaintiff was never in a position to rebut defendant's claim relative to the estimated milling yield. We find that defendant's claim is based upon testimony which was predominantly hearsay and very weak in its nature. For that reason, even if we determined the usual customary practices to be inapplicable, we would be forced to conclude that *500 defendant had failed to make its case relative to the plea of compensation.
Furthermore, we entertain some doubts concerning defendant's purchase of the second batch of rice. The mill took delivery of the first shipment, which was allegedly defective, beginning on December 21, 1973. Shortly thereafter, defendant's manager, Mr. Robertson, was informed of the fact that the rice was allegedly below the agreed quality. However, the defendant continued to accept the shipments and mill them without notifying plaintiff of its intentions to seek a reduction in price. The second shipment was purchased on or about January 3, 1974, at which time defendant obviously had knowledge of the fact that plaintiff's rice was allegedly inferior. However, defendant purchased a second shipment of rice under the same terms (92-112) as those involved concerning the first batch. It is significant that no dispute was ever made concerning the quality of the second shipment of rice which was apparently from the same storage facility as that involved in the initial sale.
Civil Code Article 2210 provides in pertinent part:
"Art. 2210. Debts not compensable
Compensation takes place, whatever be the causes of either of the debts, except in case:
1. Of a demand of restitution of a thing of which the owner has been unjustly deprived.

. . . ." (Emphasis added).
The doctrine of compensation reposes good faith. Bogert, Williams & Company v. John Egerton, 11 La.Ann. 73 (1856). A party cannot, by preconcerted artifice and with the view of paying himself, unjustly deprive a debtor of property of which he otherwise would not have gained possession. The Mutual National Bank v. Keenan and Slawson, 35 La.Ann. 1129 (1883). The case of Nolan v. Shaw & Company, 6 La.Ann. 40, 1851, concisely states the applicable principle as follows:
"Compensation must rest upon the basis of good faith. It is not permitted where its operation would involve a deception and a disappointment of the just expectation and confidence of the party against whom it is set up. Hence, if a creditor should buy goods at the shop of his debtor in such a manner as to hold out the idea that he would pay for them in cash; and after receiving the goods should propose a set off, his conduct would be considered as not in good faith and compensation would not be allowed."
By its own admission the defendant mill had knowledge of the alleged defective quality involving plaintiff's first shipment and the potential claim for reduction arising therefrom, prior to the second sale. The second purchase was made without any notice to plaintiff as to the pending claim relative to the first sale. Under the facts of this case, it is extremely difficult for us to find that the defendant did not purchase the second load of rice without the knowledge and possible intention of applying a setoff thereto. For this further reason we would disallow defendant's claim of compensation even if the custom and usage in the industry were not applicable.
For the above and foregoing reasons the judgment of the District Court is reversed. Judgment is hereby rendered in favor of the plaintiff, Fontenot's Rice Drier, Inc., and against the defendant, Farmers Rice Milling Company, Inc. in the amount of $11,830.00 representing the balance due to it by defendant on the second shipment of rice, with legal interest thereon from date of judicial demand. All costs at trial and on appeal are assessed against defendant.
REVERSED AND RENDERED.