846 So.2d 105 (2003)
Billie KARNO, Testamentary Executrix of the Succession of Nick Karno and Rosemary Caracci, Successor to Frank Caracci
v.
JOSEPH FEIN CATERER, INC.
No. 2002-CA-1269.
Court of Appeal of Louisiana, Fourth Circuit.
April 16, 2003.
*107 Richard W. Martinez, Sue Buser, Martinez & Buser, LLC, New Orleans, LA, for Plaintiff/Appellant.
Alan M. Cohen, Charles L. Stern, Jr., Steeg and O'Connor, L.L.C., and Evangeline Vavrick, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge MAX N. TOBIAS JR.).
JOAN BERNARD ARMSTRONG, Judge.
This is an appeal from a judgment of the trial court declining to dissolve a commercial lease. The lessors claim that the lease should be dissolved because the lessee breached the lease in three respects. As to each of those three alleged breaches, the trial court found as a matter of fact that the lessee had not breached the lease and/or that any breach was only minor and "technical". The trial court found as a matter of law that, to the extent that there were any breaches of the lease, they did not justify dissolution of the lease. We hold that the trial court's findings of fact are not clearly wrong-manifestly erroneous and, therefore, may not be disturbed upon appeal. E.g., Stobart v. State, DOTD, 617 So.2d 880 (La.1993). We also agree with the trial court's legal determination that any violation of the lease was not sufficient (particularly in light of the large investment that the lessee made in the property) to justify dissolution of the lease. Thus, we will affirm the judgment of the trial court.
The lessors, originally Frank Caracci and Nick Karno and later their heirs and estate respectively, owned the leased premises which consist of a French Quarter building. The lessee, Joseph Fein Catering, Inc. ("JFC"), operated a restaurant, The Court of Two Sisters, in the leased premises. There were a series of three written leases extending cumulatively over a period of more than thirty years.
The first two leases provided that, if the lessee wished to make alterations to the leased premises, then the lessee must have the approval of the lessors. Those two leases did not require that the lessors' approval of alterations be in writing. The third lease differed somewhat in that the lessors' approval of alterations was to be in writing. During the term of the third lease, the lessee performed a $932,000 renovation of the leased premises which renovation included alterations of the leased premises. The trial court found that the lessee had obtained the lessors' oral approval, but not their written approval for the alterations. The lessors dispute that trial court finding of fact, and argue that the oral approval was conditioned upon increased rent but, as we will discuss in detail below, that finding of fact is not clearly wrong-manifestly erroneous.
The trial court also found that, during the time periods covered by all the leases, including the third lease with its requirement of written approval of alterations, the lessee had a number of times performed alterations of the premises based upon oral (not written) approval from the lessors and that the lessors had never taken any exception to the lessee so proceeding based upon only oral approval. Based upon that "prior course of conduct", the trial court found that the parties had modified the third lease so as to allow lessee's alterations to the premises to proceed based upon oral (not written) approval by the lessors.
The lessors dispute the trial court's finding of a modification, and argue that *108 the prior alterations were not so extensive as the alterations at issue, but, on the record below, this factual finding of the trial court is also not clearly wrong-manifestly erroneous. Also, the trial court was correct, as a matter of law, in that the parties' course of conduct can modify a term of a written lease. See generally Gravier Co. v. Satellite Business Systems, 519 So.2d 180 (La.App. 4th Cir.1987), writ denied, 521 So.2d 1150 (La.1988); Fontenot's Rice Drier, Inc. v. Farmers Rice Milling Co. Inc., 329 So.2d 494 (La.App. 3rd Cir.), writ denied, 333 So.2d 239 (La. 1976); Versailles Arms Apartments v. Pete, 545 So.2d 1193 (La.App. 4th Cir. 1989); Housing Authority of St. John the Baptist Parish v. Shepherd, 447 So.2d 1232 (La.App. 5th Cir.1984); O'Keefe v. Breaux Mart General Meyers, Inc., 499 So.2d 598 (La.App. 5th Cir.1986), writ denied, 503 So.2d 22 (La.1987); Eldemire v. Shilts, 442 So.2d 1351 (La.App. 3rd Cir.1983), writ denied, 445 So.2d 452 (La.1984).
In any event, the trial court also found that, because the lessors took neither any legal action nor made any objections to the alterations (beyond an initial attorney's letter) for over three years after becoming fully aware of the alterations, during which time the renovation was completed at the lessee's cost of over $932,000, the lessors had waived any right to obtain dissolution of the lease due to the lessee's failure to obtain the lessors' approval in written form. The lessors argue that, shortly into the renovation project, their attorney wrote to the lessee and objected to the alterations. However, the evidence is undisputed that, shortly after that attorney's letter, the lessee and lessors arranged for an inspection of the renovation work by the lessors and, after that inspection, the lessors made no further objection to the alterations for about three years. Under these circumstances, the trial court was neither clearly wrong-manifestly erroneous as a matter of fact, nor in error as a matter of law, in determining that the lessors had waived any right to obtain dissolution of the lease due to failure of the lessee to obtain the lessors' approval in written form. If the lessors continued to have any objection to the alterations after their inspection of the renovation work, then it was incumbent upon them to at least voice those objections after the inspection rather than remaining silent for about three years (continuing to accept rent) while the $932,000 renovation project was completed. See generally Eldemire, 442 So.2d at 1353; Himbola Manor Apartments v. Allen, 315 So.2d 790 (La.App. 3rd Cir.1975); Ford v. Independent Bakers Supply, Inc., 385 So.2d 580 (La.App. 4th Cir.1980); Faber v. Gay Times, Inc., 267 So.2d 252 (La.App. 4th Cir.1972); Walters v. Coen, 228 La. 931, 84 So.2d 464 (La. 1955); Canal Realty & Improvement Co., Inc. v. Pailet, 217 La. 376, 46 So.2d 303 (1950); Adam, Inc. v. Dividend, Inc., 447 So.2d 80 (La.App. 4th Cir.1984).
The most serious issue which the lessors raise as to the trial court's decision with respect to the alterations of the premises is the lessors' contention that the trial court was clearly wrong-manifestly erroneous in finding that Frank Caracci gave oral approval for the alterations. This is important because the trial court found only that the parties' course of conduct had modified the lease to allow oral rather than written approval of alterations. The trial court did not find that the parties' course of conduct eliminated altogether the requirement of lessors' approval of alterations.
However, it is clear from the record below that the trial court was not clearly wrong-manifestly erroneous in finding that Frank Caracci (who was deceased at the time of trial) gave oral approval for *109 the alterations. Representatives of the lessee met twice with Frank Caracci and Billie Karno (Billie Karno was the widow of Nick Karno and executrix of the estate of Nick Karno). The representatives of the lessee testified that, at each meeting, Frank Caracci approved of the planned renovations while Billie Karno said nothing of substance (and thus, voiced no disagreement with Frank Caracci's approval). They also testified that Frank Caracci raised the issue of increasing the rent in connection with an extension of the lease term. The lessee's representatives were not interested in extending the lease term at that time and did not agree to increased rent. Importantly, the lessee's representatives testified that Frank Caracci did not condition his approval of the alterations upon an increase in rent and that, instead, the proposal to increase the rent was linked to an extension of the lease term. Crucially, Billie Karno testified consistently with the lessee's representatives that Frank Caracci did not condition his approval of the alterations upon increased rent. Thus, everyone who was at the two meetings testified that Mr. Caracci did not condition his approval of the alterations upon increased rent. Consequently, the trial court was not clearly wrong-manifestly erroneous in finding that Frank Caracci gave unconditional oral approval for the alterations.[1]
The second alleged breach of the lease upon which the lessors base their claim for dissolution of the lease is the alleged failure of the lessee to perform needed maintenance. The third lease did place upon the lessee the responsibility to perform maintenance. However, the trial court rejected this claim of the lessors on two grounds.
First, the lease required that the lessors give the lessee written notice of any breach and ninety days to cure the breach. The trial court found that the lessors had not given the lessee written notice of violation of the maintenance provision of the lease. The lessors respond that they filed an amended petition alleging breach of the maintenance provision, and a motion for summary judgment (which was denied) alleging breach of the maintenance provision, both more than ninety days before trial, and that the lessee did nothing to cure the alleged lack of maintenance prior to trial. We do not believe that the lease's requirement of a written notice of a violation and a ninety day period to cure contemplates pleadings and motions in litigation but, rather, contemplates a letter or other written notice given prior to the institution of legal proceedings seeking dissolution of the lease. Thus, the trial court was not clearly wrong-manifestly erroneous in finding that the lessors had not given the required written notice of violation with ninety days to cure.
Second, the trial court found as a matter of fact that the lessee had not violated the lease's maintenance provisions. The trial court found that, while there was evidence of maintenance items at the property requiring attention, given the size and age of the premises, and the lessee's history of maintaining and improving the property over a more than thirty year period, the needed maintenance items did not amount to a breach of the lease's maintenance provisions. While the lessors did produce evidence of maintenance work that needed to be done, the trial court was not clearly wrong-manifestly erroneous at least in its conclusion that the needed maintenance items were not sufficient to *110 justify dissolution of the lease. If unmet maintenance needs persist in the future, then the lessors may pursue their contractual and legal rights to compel the lessee to perform the needed maintenance.
The third alleged breach of the lease upon which the lessors based their claim for dissolution of the lease is an alleged usurpation of the lessors' authority under the lease to deal with "casualty losses" at the premises. Specifically, as the trial court found, and as is basically undisputed, a hailstorm damaged the roof of the premises. The lessee asked its regular licensed roofer to inspect the roof the next day. The roofer reported that the roof needed to be replaced immediately to prevent moisture damage. The lessee had the roofer perform the work and the roof has been watertight ever since.
The lessee argues that it acted to repair the roof in accordance with its maintenance obligations under the lease. The lessors complain that, under the lease, it was the lessors who were to deal with casualty losses and that the lessee did not even notify the lessors of the damage until the roof replacement work was well underway. They also complained that they would have used different materials to replace the roof and that some of the work was not done properly.
The trial court found that it was not clear that the lessee had violated the lease by proceeding with the roof replacement work and, if there were any violation, it was a "technical" violation of the lease that would not justify dissolution of the lease. We agree that, if the lessee did violate the lease by the roof replacement, the violation is not sufficient to justify dissolution of the lease. The lessee did act upon the advice of a professional roofer to protect the premises and was successful in so protecting the premises. The assumption of the lessee that it was not only allowed, but obligated, under the maintenance provisions of the lease, to replace the hail damaged roof, was made in apparent good faith, and was not wholly unreasonable. Even if the roof replacement was not done exactly as the lessors claim they would have done it, it met the basic objective of restoring a watertight roof on the premises.
The trial court also held that, to the extent that the failure to obtain approval in written form of the alterations, failure to perform some maintenance items, and failure to give the lessors an opportunity to deal with the hail damage, constituted breaches of the lease, those breaches were not sufficiently serious to justify dissolution of the lease after the lessee spent over $932,000 renovating the premises. We agree. The trial court has discretion to decline dissolution of a lease where it finds that the breach of the lease is not major or where the breach was not the fault of the lessor or where the lessor was in good faith. See generally Stoltz v. McConnell, 202 So.2d 451 (La.App. 4th Cir.), writ denied, 251 La. 231, 203 So.2d 559 (1967); Goldblum v. C & C Investments, 444 So.2d 642 (La.App. 5th Cir. 1983); Plunkett v. D & L Family Pharmacy, Inc., 562 So.2d 1048 (La.App. 3rd Cir.1990); Quinn Properties, Inc. v. Sabine River Realty, Inc., 95-1714 (La.App. 3 Cir. 5/29/96), 676 So.2d 639. In the present case, the trial court did not abuse its discretion in declining to dissolve the lease.
The lessors argue that the trial court erred in admitting into evidence an unsigned letter of Frank Caracci and in citing it for the proposition that the lessors were always trying to obtain more rent and even resorted to aggressive practices in that regard. However, the letter long predated the events at issue and has no *111 substantial relevance to any of the issues of whether the lessee breached the lease or whether any breach of the lease was sufficient to justify dissolution of the lease. Thus, even if the letter was admitted improperly (which we assume for the sake for simplicity), the admission of the letter was harmless error at worst.
Lastly, the lessors complain that the trial court erred by excluding the testimony of several fact and expert witnesses. The witnesses were proffered to give testimony as to alleged deficiencies in the permitting and in the plans and specifications for the renovation and as to related matters. These witnesses, while they might have proven that the permitting and the plans and specifications were improper, did not have evidence to offer on the dispositive issues of whether the lessee received oral approval of the alterations and whether it was proper for the lessee to proceed without receiving approval in written form. At most, some of he proffered witnesses might have testified that the alterations at issue were more extensive than prior alterations which had been done with oral approval. However, the trial court was fully informed by the evidence which was admitted at trial as to both the nature and extent of the renovation at issue and the nature and extent of the prior alterations. Further evidence on those points would have been merely cumulative.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
TOBIAS, J., concurs and assigns reasons.
TOBIAS, J., concurs and assigns reasons.
I respectfully concur. The majority opinion fails to note several facts that reinforce the judgment of the trial court and the affirmation by this court.
The first lease between JFC and the lessors was executed on or about 11 November 1963 and was for a term of 10 years to begin 1 January 1964. Under the first lease, the lessee agreed to "maintain the property in good condition, to make at its own expense all repairs of any kind, whether ordinary or extraordinary, it being understood, however, that any structural alterations shall be subject to approval of the Lessor." Over the course of the next 10 years, JFC undertook a number of projects to alter the property. In 1965, JFC built a second floor kitchen. In 1967, one end of the property containing the "Court Tavern" was renovated and in 1969, a dining area was enclosed and restrooms were added to the property. The record reflects that the lessors did not object to any of these alterations to the property.
JFC entered into a new lease with the property owners on 22 September 1970, superseding the 1963 lease. The second lease was for a term of 8 years beginning 1 January 1971, with a 7-year option and two-5 year options to follow. The 1970 lease contained a provision identical to the one in the original lease concerning alterations to the property and maintenance of the property. During the term of this lease, JFC made alterations to the property as they had done during the term of the first lease, including covering the patio terrace with a permanent roof; renovating the second floor kitchen; constructing a new storage building; installing a freezer and cooler; and installing new air conditioning equipment on three separate occasions. Again, the lessors made no objection to these improvements.
In 1977, JFC attempted to exercise the option in the 1971 lease, but was advised that it had breached the lease and could not extend its term. Negotiations between *112 the lessors and JFC resulted in a new lease agreement dated 20 December 1977. Under the third lease, a higher rent payment was established and the term regarding alterations to the property was amended to require written approval by the lessors of any renovations. Full responsibility for maintenance of the property was again placed on the shoulders of the lessee.
By the late 1970s, Jerome and Joseph Fein had taken control of the JFC daily operations and decided to undertake a number of renovation projects at the restaurant. They delivered the plans for the proposed projects to Frank Caracci, a co-owner of the property and co-lessor, and discussed them with him. Mr. Caracci never objected to the projects and they proceeded to make to make improvements without written approval of the lessors, even though it was technically required by the lease agreement. The trial court correctly found that this course of action, although in contravention of the lease agreement, was in accordance with the established business practices and course of conduct of the parties over the years. Failure of the lessors to object to the improvements cured any potential breach of the lease.
In 1987, the lessee's counsel notified the lessors that they once again wished to exercise the option granted under the lease to take effect 1 January 1988. Following receipt of this request, the lessors accused JFC of failing to maintain the property as required by the lease. JFC and the lessors entered into negotiations once again and agreed to amend the lease agreement to lengthen the lease agreement by 20 years, until the end of 2027, and to increase the amount of the rent.
In 1993, JFC retained an architect to reconfigure office space on the third floor of the property. However, the architect's plans were rejected by the State Fire Marshall due to numerous fire safety code violations. Thus, JFC realized that in order to make any further improvements to the property, it would have to correct the code violations that were already present in the property. Over the next year and a half, JFC obtained the necessary approvals to correct the code notations from the State Fire Marshall, the Vieux Carre Commission, and the City of New Orleans.
In mid-1996, Jerome Fein brought the plans for the renovation to Frank Caracci and Billie Karno, who was the executrix of Nick Karno's estate and who had decision-making authority for the "Karno" half of the property. The record reflects that Mr. Fein also advised the lessors that work was scheduled to begin on the renovation project between 15 August 1996 and 1 October 1996. Mr. Fein testified that Mr. Karno gave explicit approval for the project and further indicated that he believed that the rent amount under the current lease was insufficient. Billie Karno did not contribute to the discussion regarding the renovation project or to the discussion regarding rent.
Jerome and Joseph Fein had a second meeting with Mr. Caracci to discuss the renovation project in August 1996. Again, Mr. Caracci reportedly gave his approval of the renovation. Ms. Karno remained silent. Unfortunately, Mr. Caracci fell ill and passed away on 25 September 1996.
Shortly after Mr. Caracci's death, Ms. Karno's counsel sent a letter to the Feins advising them that they were in breach of the lease agreement by virtue of the fact that there was no written approval of the renovation project. The Feins denied that a default existed, and the parties agreed to an inspection of the renovations by the lessors in October 1996. The inspection took place, and no further mention was made of any alleged default for a *113 period of 3 years. In fact, the trial court noted that the renovation project continued, at an eventual cost of $932,000.00 to the lessee, and that the lessors continued to accept the rent payments made pursuant to the lease agreement without complaint. In fact, the trial court noted that when the lessee once again attempted to exercise its option to extend under the lease in February 1997, the lessors made no objection, even though every previous attempt to exercise the option had been met by Mr. Caracci with objection and an eventual re-negotiation for increased rent. In fact, no further concerns were raised by the lessors regarding the renovation project until late 1999, when this suit was filed.
The above-recited facts confirm the holding of the majority and of the trial court that the lessors tacitly acquiesced to the renovation project in question by their actions and inactions and that their conduct effectively modified the lease agreement such that no written approval of the lessors was necessary for the renovations to the property by the lessee.
As a final note, although I concur with the holding of the Court, I believe that the trial court erred as a matter of law in admitting into evidence the unsigned letter dated 31 July 1977, purportedly from Nick Karno to his counsel, as a post-trial exhibit. However, I am of the opinion that the reference to this letter in the trial court's reasons for judgment was a shorthand way for the trial court to indicate that the letter, if not properly evidence itself, merely reinforced the trial court's view of the other properly admitted evidence.
NOTES
[1] In a footnote, the lessors suggest that Frank Caracci made an "offer" that "expired" upon Frank Caracci's death or incapacity. However, the testimony was not that Frank Caracci made an offer but rather that he gave an approval that was effective when given.